UNITED STATES v. NORTH GERMAN LLOYD.

(District Court, S. D. New York. January 13, 1917.)

No. 24.

1. SHIPPING ☞81(1)—LIABILITY OF VESSEL—INJURY TO SUBMARINE CABLE—
NEGLIGENT NAVIGATION.

A steamship which went ashore in the Narrows and dropped her anchor *held* liable for injury to the government cables from Ft. Wadsworth to Ft. Hamilton, which were broken by her anchor, both because of negligence in the grounding and in handling the anchor when she was floated, although the captain was advised of the presence of the cables.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 341, 344, 345, 347.]

2. ADMIRALTY ☞22—JURISDICTION—SUIT FOR INJURY TO SUBMARINE CABLE.

Admiralty has jurisdiction of a suit for damages against a navigating vessel for injury to a submarine cable lying on the bottom of a channel.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 222–234.]

In Admiralty. Suit by the United States against the North German Lloyd. Decree for libelant.

H. Snowden Marshall, U. S. Atty., and Ben A. Matthews and John Hunter, Jr., Asst. U. S. Attys., all of New York City.

Joseph D. Bedle, of New York City, for respondent.

MANTON, District Judge. [1] On May 27, 1909, the respondent's ship Princess Alice went ashore off Ft. Wadsworth, and it is claimed by the libelant, injured the government's cables extending from Ft. Wadsworth to Ft. Hamilton. The claim is that she negligently went aground, and thereafter, without exercising due care, her anchor came in contact with the cables causing the injury. The contact of cable and anchor is sought to be proven circumstantially by the libelant. Cable signs indicating the presence of submarine cables were on the fort and on the southeast face of Battery Weed. This was a gray building at the water's edge on which is located the Ft. Wadsworth light. Another sign on uprights in letters about nine inches high was located on the bank. The claim is made, however, that because of the condition of the weather, which was foggy, these signs could not be seen. The cables were in good condition just before the grounding of the vessel and had been used. Six hours after the vessel floated, the cables were found to be damaged.

At the time of grounding, the Princess Alice was being piloted by a licensed harbor pilot, the captain in charge, and was moving in the most extensively used water in America. She went aground in the daytime in this widely traveled channel, and the evidence warrants a finding that the grounding of the vessel was due to the captain's failure to give the pilot the correct deviation of the compass for the course that would have taken his ship through the Narrows and safely out to sea. Pilot Akerman says that, had it not been for this error, his ship would never have grounded. It seems to be the captain's duty

to give the pilot the correct deviation of the compass and to check up his course.

It is the government's theory that the steamship, when she first realized the danger of going ashore, dropped her anchor and dragged it inshore, picking up the cables as the anchor dragged over their location, and thereafter the anchor chain was pulled in, causing the cables to be pulled taut, but not damaging the same. At high tide the vessel was floated by using her own power, both engines full speed astern, with the assistance of some eight or ten tugboats. With this force supplied, the ship moved from her position, and the anchor then entangled in the cables, snapped the cables, parting them into various sizes. The cable hut at the Ft. Wadsworth side was to the starboard of the vessel, and her anchor fast to the cables was out on the starboard side, and these cables ran immediately from the quartermaster's dock to the anchor and thence under the vessel as she lay grounded. In this position the strain of the anchor on the cables as the vessel was moved off shore would slide along the cables and pull the cables or slide them along the keel of the vessel.

Early on the morning of the 28th, it was learned that the cables had been torn out during the night. The armor was torn off the insulation, showing that it had been a very heavy strain. The cable was found 200 feet off the end of the quartermaster's pier and was broken off and pulled right out to sea; that is, in the river. The chain holding it and the ring bolt and fastening in the concrete in the cable hut were torn out and jammed in the conduit, smashing the conduit pipes. The splices of the cable were broken open, and the water poured into it and destroyed the cable by soaking the paper. The point of contact is given as 100 feet from the end of the quartermaster's dock.

The testimony, given in considerable detail, indicates a very severe strain and subsequent breaking of the cables. If the anchor of the vessel came in contact with this cable, it, with the subsequent floating of the vessel with the anchor entangled, would be a sufficient reason for the very much damaged condition of the cable.

While no one saw the anchor actually in contact with the cable, the location of the grounding of the vessel, together with the subsequent finding of the cables in the condition as found, and the time of the finding thereof, justifies a finding from the circumstances that the Princess Alice was responsible for the damage to these cables.

That the running aground of the vessel was negligent could hardly be disputed in view of the evidence of Pilot Akerman taken in conjunction with the location of the grounding of the vessel. After the vessel grounded, Capt. Hines pointed out the location of the cables to the captain of the Princess Alice, told him to exercise care so that his anchor might not become entangled with it, and Col. Haan gave notice to one of the tug captains, who was engaged in attempting to float the vessel, of the location of the cables with instructions to tell the captain of their location. This message was delivered. Therefore the captain of the vessel had specific warning as to the location of the cables if the signs on the fort were not sufficient notice to him in view of the foggy condition of the weather. So handling the anchor, after

such notice, as to permit it to come in contact with the cables, as the evidence inferentially justly permits, in my opinion, was negligence.

The evidence further justifies the finding that the ship was without the anchorage limits which extend from the lighthouse shown on the government Exhibit I, in a northerly direction. The course of the Princess Alice as she lay aground was about south-southwest or south by west. The bow of the Princess Alice was about 15 feet from the sea wall, which in turn was about 20 feet from the wall of the fort. The lighthouse was further in, so that the bow of the ship must have been about 50 feet from the line of the anchorage limits. The bow of the ship was the point of the ship nearest the anchorage limits, for the course of the ship and the anchorage line diverge northward.

The Act of February 29, 1888 (25 Stat. L. 41; Comp. St. 1913, § 10090), section 4 thereof, makes it a crime for the master of any vessel to fail in proper observations of the rules and provisions of the International Convention for the protection of submarine cables, and section 8 provides:

"That the penalties provided in this Act for the breaking or injuring of a submarine cable shall not be a bar to a suit for damages on account of such breaking or injury." Comp. St. 1913, § 10094.

[2] These facts require a finding that the Princess Alice was negligently grounded and afterward floated in a negligent manner, resulting in injury to the cables in question, and will warrant a decree for the libelant unless the respondent's claim that admiralty has no jurisdiction be sound.

The case of Postal Telegraph Cable Co. v. P. Sanford Ross (D. C.) 221 Fed. 105, settles this claim adverse to the respondent unless it can be said that this rule was not approved in The Raithmoor, 241 U. S. 166, 36 Sup. Ct. 514, 60 L. Ed. 937. Judge Chatfield in the former case decided that a dredge coming in contact with a submarine telegraph cable crossing a tidewater navigable channel and resting on the bottom, although fastened on shore at each end for connection with land wires, was responsible in admiralty for damages inflicted on such cables due to the negligence of the dredge, holding that, where a cable lies in the bottom of a channel, it is within the admiralty jurisdiction and is maritime.

Counsel for respondent argues, however, that this rule was not approved in the later Raithmoor Case, while the case of Postal Telegraph Cable Co. v. Ross was cited to the Supreme Court. It is not discussed in the opinion, nor is it disapproved. In the Raithmoor Case, a libel was filed in rem against the steamship Raithmoor to recover damages for tort due to the steamship while coming up the Delaware river, coming in contact with a scow or pile driver and a structure then being erected by the United States government to serve as a beacon and with a temporary platform used in connection with the work of construction. The Supreme Court held, reversing the District Court, that jurisdiction in admiralty existed under these facts. The court said:

"We regard the location and purpose of the structure as controlling from the time the structure was begun. It was not being built on shore and await-

ing the assumption of a maritime relation. It was in course of construction in navigable waters, that is, at a place where the jurisdiction of admiralty in cases of tort normally attached—at least in all cases where the wrong was of a maritime character."

As I read this decision, I do not think it essential that the object injured should itself be an aid to navigation before liability attached in admiralty. Its location is controlling, and if, by reason of its location, it has a maritime relation, it is within the admiralty jurisdiction.

Since the injuries had to do with the operations of navigation, and the cable itself was connected with the subject of navigation when occupying some portion of the navigable channel, and was not a structure on land nor affixed thereto as a part thereof, I am of the opinion that admiralty has jurisdiction, and for these reasons will grant a decree in favor of the libelant.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes