# NIPPON YUSEN KABUSHIKI KAISHA v. GREAT WESTERN POWER CO.*

(Circuit Court of Appeals, Ninth Circuit. January 31, 1927.)

No. 4786.

**1. Admiralty ⬉22—Damages to submarine power cables through negligence of ship held not recoverable in admiralty.**

Damages to submarine power cables, extending across bay, through negligence of ship, drifting and dragging its anchor, *held* not recoverable in proceeding in admiralty.

**2. Admiralty ⬉22—Ship's damage to land structure is not recoverable in admiralty, under American admiralty law.**

Ship's damage to land structure is not recoverable in admiralty under American admiralty law, notwithstanding ship may always claim her damage in court of her domain for injury done to her by land structure.

**3. Admiralty ⬉1—Federal courts have "admiralty and maritime jurisdiction," as it was known when Constitution was adopted, not limited to tidal waters, nor extended to cover every claim for damage by ship.**

Under Constitution, federal courts have such admiralty and maritime jurisdiction as was known and understood in the United States when the Constitution was adopted, not limited to tidal waters, nor extended so as to cover every claim of damage done by ship.

[Ed. Note.—For other definitions, see Words and Phrases, Admiralty Jurisdiction.]

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Kerrigan, Judge.

Libel by the Great Western Power Company against the Nippon Yusen Kabushiki Kaisha. From a decree for libelant, respondent appeals. Reversed, with direction to dismiss.

Pillsbury, Madison & Sutro and Felix T. Smith, all of San Francisco, Cal., for appellant.

Ira S. Lillick, of San Francisco, Cal. (Theodore M. Levy, of San Francisco, Cal., of counsel), for appellee.

Before GILBERT and HUNT, Circuit Judges, and JAMES, District Judge.

JAMES, District Judge. Appellee, at the time the cause herein concerned arose, was engaged in furnishing electric power for industrial uses in the city of San Francisco. Some part, at least, of the electric energy distributed by it, was generated at a point distant from San Francisco, and was conducted from the Alameda county shore across the bay through two cables. These cables, so far as can be learned from the record, rested on the

*Certiorari denied 47 S. Ct. 591, 71 L. Ed. —.

floor of the bay. Where the cable emerged from the water at pier 18 on the San Francisco water front, signs were displayed which indicated the fact that there was a cable crossing at that point. At and about this place the bay extended, being navigable and in constant use by shipping.

The power cables were each composed of three copper conductors, separately covered, first with rubber and varnished cambric; next the three were combined within varnished cambric and an overlying sheath of lead, the latter in turn being covered with jute. About this jute was wound steel wire. An envelope of jute composed the final covering. As a support for the conductor cables, and to lessen the strain of the pull, a steel cable was laid parallel with the conductors, and attached firmly to them at regular intervals. The supporting steel cable was first laid, and fastened at the shore ends by being noosed over piling at the piers. As the conductor cables were laid, the steel cable was picked up and fastened to the former. The combined weight of the cables carried them to the bottom of the bay, where they were at rest, uncovered otherwise, except as they might sink into the mud or ooze.

On October 26, 1917, a large steamship belonging to appellant anchored in the bay at a point where she had a clear right to stop. She was coaled from barges that were brought out by tugs. After having received sufficient fuel, she remained at anchor for a number of hours. One of the coal barges, with part of its load aboard, was anchored close by. This barge and the steamship contacted later, and the steamer was caused to swing around broadside to the wind and tide. Under the pressure of the latter forces, the steamship drifted some distance, dragging her anchor, until it came in contact with the power cables of appellee. The cables were cut and damaged by the anchor. For that cause appellee brought a libel in personam, and was allowed to recover.

[1] As appellant concedes that the determination of the District Court that the ship was negligent should be taken as correct, a more particular statement of the evidence need not be made. The question of law, which is the chief matter urged in support of the appeal, is that the injury to the cable gave rise to no right or remedy in admiralty, but that redress must be had in a common law action.

Asserting the familar rule of American maritime law that torts to be marine must be consummate upon water, appellant declares that a power cable, having its attachments on

shore, and being used wholly in aid of land commerce and business, is not a marine structure, and has not the smallest relation to navigation. The cable of appellee was attached to shore fixtures before it entered the bay on the one side and as soon as it left it on the other. It was not an aid to navigation, nor connected with shipping or water-borne commerce in any way. The injury was caused to it as it lay in the field and path of navigation, where it had permission to be. It was both placed and injured in the marine element. And so the locus of the tort was properly claimed, provided the cable was not so connected with the shore as to give its submerged length character as a commercial utensil having to do wholly with business on the land.

[2] That there is no reciprocal remedy in admiralty in favor of a land structure against a ship for damage committed by the latter is affirmed in the American admiralty law—notwithstanding that the ship may always claim her damage in the court of her domain for injury done to her by the former. The Plymouth, 3 Wall. 20, 18 L. Ed. 125, is the leading case. There a fire was communicated by a ship to a wharf, and, as the wharf was a land structure, it was held no tort consummate upon water was proved, and admiralty jurisdiction was denied. This case drew a sharp line of differentiation between the American doctrine and the English Admiralty Act (St. 24 Vict. § 7), which allowed cognizance of any claim for damages done by a ship in navigable waters. It established the law definitely that a land structure, whether used in connection with ship commerce or not, provided no maritime locus to support a tort libel; the attachment to the land seeming to be the determining factor. With the law so established the case of The Blackheath, 195 U. S. 361, 25 S. Ct. 46, 49 L. Ed. 236 (a libel for damage done by a ship to a beacon used to warn shipping and foundationed upon a point of land), arose. The court sustained admiralty jurisdiction, but particularly declared that in making its ruling there was not encountered "The Plymouth or any other authority binding on this court." In The Blackheath the court reasoned that the beacon was a government aid to navigation, fastened to a point which was *only technically land*, injured by the motion of a vessel beginning and consummated upon navigable water. Justice Brown, in concurring in the decision, stated that as he considered it, the case overruled former cases and recognized the principle of the English admiralty law extending maritime remedies to all injuries committed by a ship.

Following this case came the Cleveland Terminal & Valley Railroad Co. v. Cleveland Steamship Co., 208 U. S. 316, 28 S. Ct. 414, 52 L. Ed. 508, 13 Ann. Cas. 1215, where a ship had injured a pier of a swinging drawbridge spanning a navigable river. The court held there was no jurisdiction in admiralty in favor of the bridge owner. And the Chief Justice, referring to The Blackheath, and to Justice Brown's interpretation of its effect, stated that the law of The Plymouth was not overruled thereby. Again, in Martin v. West, 222 U. S. 191, 32 S. Ct. 42, 56 L. Ed. 159, 36 L. R. A. (N. S.) 592, a case where a ship collided with a span of a toll bridge, the test of locality of the tort was not answered, the court declared, so as to give admiralty jurisdiction. The Raithmoor, 241 U. S. 166, 36 S. Ct. 514, 60 L. Ed. 937, applied the Blackheath decision to facts similar to those shown in the latter case—the injury by this ship being to an uncompleted beacon being erected by the government—but extended the doctrine of locality not at all beyond the special conditions there present.

There is to be noted, also, a case decided by the District Court of the Southern District of New York, the decision being later affirmed by the Supreme Court without opinion. The Poughkeepsie, 162 F. 494; Id., 212 U. S. 558, 29 S. Ct. 687, 53 L. Ed. 651. There, wrought iron pipe, extending above the surface of the river, and being used to make borings in the bed thereof as a part of the process of constructing a water conduit under the river, was injured by steamers. The protruding pipe was completely surrounded by navigable water. In ruling against admiralty jurisdiction District Judge Adams said: "The project which the libelant was engaged in is not even suggestive of maritime affairs, * * * nor was it in any sense an aid to navigation, which was the distinguishing feature in the Blackheath."

No case involving damage to cables, where an admiralty remedy was claimed, so far as we are advised, has yet reached the Supreme Court. At least three such cases have been decided in the District Courts, and admiralty jurisdiction was sustained on claims made by the owners of the cables. They were all cables used for the purpose of transmitting telegraph messages. See U. S. v. North German Lloyd (D. C. So. Dist. N. Y.) 239 F. 587; The Toledo (D. C. N. J.) 242 F. 168; Postal Telegraph Cable Co. v. P. Sanford Ross (D. C. E. Dist. N. Y.) 221 F. 105. The judges deciding these cases epitomized their reasoning and conclusions as follows:

Judge Manton, in 239 F. 587: "Since

the injuries had to do with the operations of navigation, and the cable itself was connected with the subject of navigation when occupying some portion of the navigable channel, and was not a structure on land, nor affixed thereto as a part thereof, I am of the opinion that admiralty has jurisdiction."

Judge Davis, in the District Court of New Jersey, in The Toledo said: "When a vessel on the high seas or navigable waters of the United States commits a tort by negligently injuring a cable, the contention that the cable was lying on the bottom of the river or sea, and the ends thereof ultimately reached the land, and therefore admiralty does not have jurisdiction, ought not to prevail, when all of the other elements necessary to constitute a maritime tort are present."

And Judge Chatfield, in the Eastern district of New York in the Postal Telegraph Cable Case said: "But as the court is of the opinion that a submarine cable of this sort is not a *structure on the land and affixed thereto* as an extension of the shore, * * * even though connected therewith as an aid to land commerce, it is therefore subject to maritime control."

[3] To summarize: The Constitution gives to the federal courts such admiralty and maritime jurisdiction as was known and understood in the United States when the Constitution was adopted; not limited to tidal waters (The Genesee Chief, 12 How. 443, 13 L. Ed. 1058), as restricted by the English courts, nor extended so as to cover every claim for damage done by a ship, as is provided in the English statute (The Raithmoor, supra).

Mr. Hughes, in his work on Admiralty (page 198, 2d Ed.), takes note of the fact that federal trial courts have in several instances sustained admiralty jurisdiction where ships have injured telegraph cables, and remarks: "It is hard to draw any distinction between such injuries and that complained of in The Poughkeepsie."

It is with even more difficulty that jurisdiction may be justified of claims for an injury committed to a cable used solely for the carrying of electric power. In the decisions in the telegraph cable cases, where the judges say that the cable is "connected with the subject of navigation," that expression can mean no more than that the cable is established in navigable water, unless the assumption is indulged that such cable has some use in navigation by the transmission of messages therethrough to direct the course and movement of vessels. No such use can follow as an incident to the purpose of the power cable.

Suppose that such a structure as is called

a "cable" was made to contain within a waterproof casing a steel shaft (or a linked and flexible propeller chain), which upon being revolved by means stationed on one shore, communicated power to a machine located on the opposite bank of a narrow though navigable strait: Would the fact that the shaft was covered with a material impervious to water, and was strung along the floor or bottom of the strait, give it a marine character and entitle damages for its injury to be recovered in admiralty? The question, we think, must be answered in the negative. There can be no difference in legal estimation between the wire core through or along which electric energy is made to travel, and the revolving shaft which communicates physical impulses from bank to bank.

A power company engaged in conveying electrical energy for great distances, as is common nowadays, may find that it can save land equipment and expense by adding insulation and dropping its lines to the beds of navigable rivers wherever it is desired to cross them. If the decisions in the telegraph cable cases are applicable, the lines under water become detached from the land structures and take character as a segment distinct from the rest of the physical system—a legal amphibian, truly. It would seem that such a segment cannot be thus separately defined, without support from the very criterion— that every injury committed by a ship is compensable in admiralty—which the Supreme Court of the United States has said is no part of American maritime law.

Perhaps in the expanding scope of the industries, and the adoption of new methods and means for the transmission of power, with utilization of sea, river, and lake beds as supports for conduits and conveyances, it will be thought that a condition of business necessity exists as will justify the further extension of the admiralty jurisdiction, and perhaps the present case furnishes facts favorable to such an extension. In our view, however, to so declare the law to be is to mark a step beyond the admiralty field as we understand it to have been thus far established by the decisions of the Supreme Court.

The second and remaining point made by appellant, that under the express terms of the permit issued by the War Department, and under which the power cables were laid, the permittee waived all right to claim damages for injuries to its cables caused by the anchors of ships, it is not necessary to consider, in view of the conclusion announced on the question of jurisdiction.

The decree is reversed, with direction to

the District Court to dismiss the libel for want of jurisdiction; appellant to recover its costs.