## MORROW S. S. CO. v. SUPERIOR WATER, LIGHT & POWER CO.

District Court, W. D. Wisconsin. May 14, 1928.

Holding, Duncan & Leckie, of Cleveland, Ohio, and Cadigan & Cadigan, of Superior, Wis., for libelant.

Grace, Fridley & Crawford, of Superior, Wis., for respondent and cross-libelant.

LUSE, District Judge. The cable in question extended in a northeasterly and southwesterly direction across the Bay of Superior from the Wisconsin shore to the shore of Minnesota Point, crossing the main channel of Superior Bay about at right angles and a very short distance northwesterly from the slip on the northwesterly side of Elevator K in Superior. This slip was about 100 feet wide and 600 to 800 feet long alongside Elevator K, and the channel was dredged in front of Elevator K and this slip about 200 feet out of the main channel, which was about 400 feet in width. Some time previously the cable, which ordinarily lay upon the bottom of the bay, had parted probably because of the dragging of an anchor by some unknown vessel. On the day in question respondent was endeavoring to repair this cable and had employed a tug to handle the cable, and in the process the cable had been in part floated by use of barrels or buoys placed about 20 feet apart and over a stretch of the cable extending about 400 feet. The break in the cable was near the Wisconsin shore and prior to the Callender's coming upon the scene had been placed by the tug in position where it was expected to make a splice where the cable had parted, release the cable from the barrels, and lower it into place, and at that time the tug was discharged, leaving three men employed by respondent with a raft and rowboat to complete the repairs. The master of the Callender noticed the line of barrels when the vessel was about two miles distant from them, and about the same time the employees of the respondent noticed the vessel, and inasmuch as the cable in its then position lay across the channel, they immediately commenced to get it out of the way by using a kedge anchor and pulling the rowboat along with the end of the cable attached. The object of the respondent's employees was to pull the cable in a northwesterly direction so that it would lie parallel with and on the Minnesota side of the main channel, down which the Callender was proceeding, and thus clear the channel. They succeeded in doing this, except that the weight of the cable became so great that they were unable to straighten it entirely and a loop or bight extended about 50 feet into the main channel from the northeasterly or Minnesota side thereof. The three men had not sufficient strength to straighten the cable out entirely, and when they had pulled it as far as they could, they anchored it. In the meantime the Callender had got about opposite the bight and was about to make the turn into the slip of Elevator K. Respondent's employees anchored the end of the cable and then proceeded toward the bight, intending to get hold of the cable at a point in the bight and thus pull it out of the channel; but before they arrived the cable had become entangled in the propeller.

From the time that the master of the vessel first saw the barrels he kept track of them, knew where they were, checked the speed of his vessel, and testified that when he passed them they were clear of the channel. However, in this he was mistaken.

Prior to reaching a point where the bow of the Callender was opposite the slip, her engines were stopped; but as they made the turn the engines were given a "kick ahead" and then a "kick behind," and while the engines were reversed, apparently the suction drew the cable and its supporting barrels into contact with the propeller. The second mate of the Callender was at his position aft, and as they started to make the turn, he was standing at the stern of the vessel leaning upon the rail. He also saw the barrels.

I am satisfied that each of the witnesses on both sides of this case has given his story just as the facts appeared to him, but after considering the evidence I am convinced that the Callender was making headway at all times and that at no time did she reverse her engines for a sufficient length of time to give the vessel sternway. The Callender was 375 feet over all, and in making the turn must of necessity have occupied the greater part of the 400-foot channel.

I am satisfied that the employees of the respondent did everything that could be reasonably expected of them after they sighted the Callender; but it is concluded that in view of the testimony of Mr. Bishoff, who had charge of the repair operation for the respondent, that vessels were coming and going down this channel quite often, it was a mistake and a fault on the part of the respondent to discharge the tug at the time it was discharged. Considerable time was necessary to splice the cable and release it from the barrels so as to lower it into position after the tug was discharged, and as the cable then lay afloat across the main channel of the bay, it ought to have been foreseen that necessity would probably arise for clearing the channel before the operation of splicing and lowering the cable could be completed. Had the tug been retained, I have no doubt that the channel could have been cleared of the cable promptly and wholly. Libelant makes the point also that the tug would have had a whistle with which it could have signaled the Callender, but I do not think this point is well founded for the reason that the master and second mate of the Callender saw the barrels and knew, or ought to have known, in the exercise of due care, that a cable was being supported by them. There was a sign plainly visible on the Wisconsin shore which contained the information that cables were laid across at that point which, together with the string of barrels being towed, would indicate quite clearly the character of the operation that was being carried on by respondent's em-

ployees. It is not seen where the tug's whistle could have given the vessel any more information than it had under the circumstances.

As already indicated, the master knew where the barrels were at all times, and as the Callender approached Elevator K, the second mate also knew where they were. In fact, the latter stood in the stern of the vessel and watched the barrels, and saw one or more of them drawn under water, which was undoubtedly caused by the entanglement of the cable with the propeller. The circumstances indicate quite clearly that in view of the size of the Callender, she could not make the sharp turn into the slip at Elevator K without swinging her stern around into a dangerous proximity with the barrels and whatever they were sustaining. No one knew the effect of attempting to make this turn and the suction effect of the necessary engine reversal to make the turn better than the master and second mate of the vessel. As I view the evidence, there was no reason why the Callender could not have stopped in the main channel before making the turn and given respondent's employees time to reach the bight and pull it clear of the channel. The failure of the Callender to do this, in my opinion, was a fault which materially contributed to the injury and damage.

It is therefore concluded that both parties were at fault, the respondent in prematurely discharging the tug and leaving its employees with inefficient equipment to properly keep the channel clear for shipping, and the Callender for failing to delay in making her turn into the elevator slip until respondent's employees could pull the portion of the cable comprising the bight beyond the northeasterly line of the channel.

No doubt it appeared to the employees of respondent that the Callender reversed her engines until she actually had some sternway. It would be quite natural that it should appear so to them as they approached in the small boat, but I am satisfied that all that the Callender did was to operate so that her stern swung to port.

Libelant insists that the admiralty court has no jurisdiction of the claim of respondent for damages under its cross-libel, the cable being an instrumentality of land commerce only, and relies upon the case of Nippon Yusen Kabushiki Kaisha v. Great Western Power Co., 17 F.(2d) 239 (C. C. A. 9).

The contention of libelant that the cable was used when in place solely for land commerce by the respondent, I think, is correct. The respondent is a public utility and dis-

488

tributes in the city of Superior water which it takes from Lake Superior and pumps through pipes lying under the Bay of Superior and the channel in question for distribution in the city. This water is pumped ordinarily by a pumping station located upon the Superior shore, but there are auxiliary pumps located on Minnesota Point, and this cable carries power from the Wisconsin side to the Minnesota side for the purpose of operating those pumps when occasion requires. When in position the cable in question lies upon the bed of the bay. The cable is so maintained by the respondent under permission from the Government War Department, and such permission, of course, includes the right of repair when necessary.

Careful reconsideration has been given to the cases of The Plymouth, 3 Wall. 20, 18 L. Ed. 125; The Blackheath, 195 U. S. 361, 25 S. Ct. 46, 49 L. Ed. 236; Cleveland, Terminal & Valley Railway Co. v. Cleveland Steamship Co., 208 U. S. 316, 28 S. Ct. 414, 52 L. Ed. 508, 13 Ann. Cas. 1215; Martin v. West, 222 U. S. 191, 32 S. Ct. 42, 56 L. Ed. 159, 36 L. R. A. (N. S.) 592; The Raithmoor, 241 U. S. 166, 36 S. Ct. 514, 60 L. Ed. 937; The Poughkeepsie, 212 U. S. 558, 29 S. Ct. 687, 53 L. Ed. 651, and consideration has also been given to the cases of United States v. North German Lloyd (D. C.) 239 F. 587; The Toledo (D. C.) 242 F. 168; Postal Telegraph Cable Co. v. P. Sanford Ross (D. C.) 221 F. 105.

Having in mind that at the time of the accident in question, the portion of the cable involved was afloat in navigable waters and that it was so afloat in the progress of a lawful operation to repair the cable, it is clear that the wrong involved in this case was committed wholly on navigable waters and the substance and consummation of the wrong took place upon those waters, so that whatever cause of action exists in the respondent by reason of the damage to its cable became complete within the locality upon which admiralty jurisdiction depended within the rule of The Plymouth, 3 Wall. 20, 18 L. Ed. 125, and Cleveland, T. & V. R. Co. v. Cleveland Steamship Co., 208 U. S. 316, 28 S. Ct. 414, 52 L. Ed. 508, 13 Ann. Cas. 1215. At the time of the accident in question, this cable was in fact being navigated, in a limited sense, upon navigable waters and temporarily at least was a part of navigation. In this respect the case is clearly distinguishable from the Nippon Case, supra, and after due consideration it is concluded that admiralty has jurisdiction of the cross-libel.

It is not thought necessary to appoint a commissioner to hear the question of damage, which will be heard by the court at a time to be set later.