[Civ. No. 19931.   First Dist., Div. Two.   Jan. 30, 1962.]

JOHN APODOCA, Plaintiff and Appellant, v. SCHIF-FAHRTSGESELLSCHAFT DE VRIES & CO. M.B.H., Defendant and Respondent.

Dorsey Redland for Plaintiff and Appellant.

Norman B. Richards, Mark O. Kasanin and McCutchen, Doyle, Brown & Enersen for Defendant and Respondent.

AGEE, J.—Plaintiff longshoreman appeals from a summary judgment entered in favor of defendant charterer, respondent herein. On March 4, 1959, while the vessel M. S. Samundar was unloading cargo at the Port of Oakland, a sling broke and caused wire bales to fall upon and injure appellant. The unloading operation was being conducted by Marine Terminals, Inc., which was an independent contractor and appellant's employer. The sole business of the M.S. Samundar in the San Francisco Bay area was to discharge its cargo.

Electing to proceed against other than his employer, pursuant to the Longshoreman's and Harbor Workers' Compensation Act (33 U.S.C.A. §§ 901-905), appellant brought this action for damages for personal injuries against the owner of the vessel, Cia De Navegacione Del Plota, a corporation, and the charterer, herein sometimes referred to as "De Vries," on the theory that they were negligent in the operation of the vessel and maintained it in an unseaworthy condition. No appearance herein has as yet been made by the owner. The respondent (charterer) filed a motion for summary judgment on the basis that it was a time charterer only and, therefore, was not liable for appellant's injuries.

In support of such motion, respondent's co-owner and director (Wiener) executed and filed an affidavit that the vessel was being operated at the time of appellant's accident under the terms and provisions of a time charter executed by and between the owner and De Vries; that an exact copy of said charter was attached to his affidavit; that said charter was in effect on March 4, 1959; that, if sworn as a witness, he could testify competently thereto. These statements were uncontroverted and the trial court was entitled to accept them as true. (*Cone* v. *Union Oil Co.*, 129 Cal.App.2d 558, 562 [277 P.2d 464].) Affidavits of appellant and his counsel were filed in opposition but both showed on their face that they contained only hearsay matters to which neither would be competent to testify. In fact, neither of these affiants ever alleged that he was so competent. Their averments were therefore of no value. (*Bennett* v. *Hibernia Bank*, 186 Cal.App.2d 748, 754 [9 Cal. Rptr. 896]; Code Civ. Proc., § 437c.) The affidavits also related what appellant *expected* to prove at the trial. These expectations cannot be considered on a motion for sum-

mary judgment. (*Spencer* v. *Hibernia Bank,* 186 Cal.App.2d 702, 715 [9 Cal.Rptr. 867].)

The appellant and respondent agree that the issue on appeal narrows down to whether the charter is one of demise or what is known as a "time charter." ▮ Under a demise charter, the charterer is considered as having the duties of an owner in possession and could therefore be held liable to the appellant in the particular situation involved herein. (*Cannella* v. *United States* (2 Cir. 1950) 179 F.2d 491; *Vitozi* v. *Balboa Shipping Co.* (1 Cir. 1947) 163 F.2d 286.) ▮ A time charterer, in a sense, merely rents cargo space and has no such liability. (*Bergan* v. *International Freighting Corp.* (2 Cir. 1958) 254 F.2d 231; *Randolph* v. *Waterman Steamship Corp.* (E.D. Pa. 1958) 166 F.Supp. 732; *Hoodye* v. *Bruusgaard Krosterud Skibs A/S Drammen, Nor.* (S.D. Tex. 1961) 197 F.Supp. 697.) Under the caption, "The Issue Presented," appellant states: "The parties agree that there can be no liability on the part of respondent unless there has been a demise of the vessel to respondent."

Both parties quote Gilmore and Black, "The Law of Admiralty" (1957) with approval. It is stated therein:

"Charter parties are highly standardized. There are three main types:

"A. *The Voyage Charter*. In this form, the ship is engaged to carry a full cargo on a single voyage. The vessel is manned and navigated by the owner.

"B. *The Time Charter*. In this form, as in the voyage charter, the owner's people continue to navigate and manage the vessel, but her carrying capacity is taken by the charterer for a fixed time for the carriage of goods anywhere in the world (or anywhere within stipulated geographic limits) on as many voyages as approximately fit into the charter period. . . .

"C. *The Demise or Bareboat Charter*. In this form, the charterer takes over the ship lock, stock and barrel, and mans her with his own people. He becomes, in effect, the owner pro hac vice, just as does the lessee of a house and lot, to whom the demise charterer is analogous." (At pp. 170-171.) The text continues:

"*How to Recognize a Demise*. The first problem is of course that of distinguishing the demise from the regular time and voyage charters. The test is one of 'control'; if the owner retains control over the vessel, merely carrying the goods

furnished or designated by the charter, the charter is not a demise; if the control of the vessel itself is surrendered to the charterer, so that the master is his man and the ship's people are his people, then we have to do with a demise. In the forms actually used for chartering today, it is usually quite clear which of these arrangements is intended. It is common practice, as well, for the charter to contain an express stipulation in this regard; the time charter we have examined, in its Clause 26, expressly provides that it is not to be construed as a demise; it could not be in any case, for, as in most time charters, it is perfectly clear that the owner retains control over the navigation and management of the vessel." (At pp. 216-217.)

### The Charter—Demise or Time?

The charter involved herein is on a printed form entitled "Time Charter—Government Form—Approved by the New York Produce Exchange—November 6th 1913—Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946." This printed form is the exact duplicate of that printed in Gilmore and Black, *supra*, pp. 802-809, and is stated therein to be a "standard time charter." (P. 204.)

Many cases have held that the government form time charter does not amount to a demise. Among these are the following: *The Terne: Bergen Lloyd A/S* v. *Munson S.S. Line* (2 Cir. 1933) 64 F.2d 502, cert. denied, 290 U.S. 635; *The Niels R. Finsen* (S.D. N.Y. 1931) 52 F.2d 795; *Barnevo* v. *Munson S.S. Line*, 239 N.Y. 486 [147 N.E. 75]; *Munson S.S. Line* v. *Glasgow Nav. Co.* (2 Cir. 1917) 235 F. 64, cert. denied, 243 U.S. 643; *Luckenbach* v. *Insular Line* (2 Cir. 1911) 186 F. 327; *The Santona* (S.D. N.Y. 1907) 152 F. 516.

In *Barnevo* v. *Munson, supra,* the facts are identical to those in the instant case. There also the plaintiff longshoreman was employed by an independent contractor to unload a vessel. He was injured when a hatch cover fell on him. The appellate court stated: "The appellant Munson Steamship Line [charterer] complains because the court charged the jury that it was in the charge and possession of the steamship for the purpose of discharging the cargo and in substance refused to charge that under the charter party the owner and not the charterer was under the legal duty of discharging the cargo. Looking at the evidence . . . we find that the only evidence in the record to show the relation of Munson Steamship Line

to the unloading of the vessel is the charter party, which provides:

" '25. Nothing herein stated is to be construed as a demise of the steamer to the Time Charterers, The Owners to remain responsible for the navigation of the Steamer, insurance, crew and all other matters, same as when trading for their own account.'

"It also provides, among other things, that 'Charterers are to *load*, stow and trim the cargo at their expense under the supervision of the captain.' . . .

"The trial justice erred in stating the duty of the charterer on this record. . . . *The charter known as the government form, is not a demise;* the officers and crew of the ship are not the officers and crew of the charterer. The jury should have been so instructed." (Emphasis partially added.) Judgment against the charterer was reversed. It is to be noted that the quoted provisions of the charter in the cited case are identical with those of the charter in the instant case.

■ The reason that charters of the type involved herein are held not to be a demise is that the owner retains control over manning, navigating, equipping and maintaining the vessel. This is expressly provided for in clauses 1, 22, and 26 of the instant charter.

"1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service. . . .

"22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) . . . also providing ropes, falls, slings and blocks. Owners also to provide on the vessel lanterns and oil for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The Charterers to have the use of any gear on board the vessel.

"26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account."

Appellant contends that other provisions in the charter present facts from which it could be determined that there was a ''demise'' of the vessel. The one most emphasized is as follows:

''8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, . . .''

This clause is not concerned with matters of navigation and is not intended to shift the responsibility for the safe navigation of the vessel from the owners to the charterers. (Carver, Carriage of Goods by Sea (10th ed.), p. 259.) The word ''employment'' obviously means employment of the vessel. The provisions of a contract should be given a reasonable interpretation. One of the first provisions in the charter requires the owner to have the vessel ''ready to receive cargo . . . (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage) to be employed in carrying lawful merchandise, . . .'' Immediately following is the provision, already quoted herein, that ''the Owners shall provide and pay for all . . . wages . . . of the Crew; . . .'' Matters connected with the handling of the cargo, which must be done at the expense of the charterer, but under the supervision of the captain, may well involve third party agencies which would be under the orders and directions of the charterers. There is nothing whatsoever in clause 8 which is inconsistent with a time charter.

Appellant calls attention to provisions of the charter which allow the charterer to engage the vessel in ''world-wide trading,'' excluding certain areas; that the cargo be loaded or discharged at places designated by the charterer; and that the charterer ''furnish the captain with all requisite instructions and sailing directions.'' These provisions are completely consistent with a time charter. It is clear from the provisions of the charter, particularly clause 26, quoted above, that the owner is to navigate and be responsible for the navigation of the vessel, ''same as when trading for . . . [his] own account.'' The fact that the charterer designates the ports of call in no way indicates a demise. The very basis of the charter is that the charterer has cargo which he desires

transported from one port to another and, in order to do so, he must instruct the captain where to sail.

Other provisions cited by appellant have to do with temporary matters, such as requiring charterer to provide necessary dunnage and shifting boards, also "any extra fittings requisite for a special trade or unusual cargo . . .''; charterer to have option of painting vessel's funnel and ship's sides with their insignia but same to be repainted to original design on completion of charter party; and charterer "to have the option of erecting false wooden decks provided no damage is caused to vessel's hull and vessel's construction not modified." None of these provisions is inconsistent with a time charter, in which, as we have seen, the owner retains control of the operation and maintenance of the vessel.

Appellant cites a clause in the charter which requires the charterer to pay certain expenses, such as fuel, port charges, and pilot fees. This arrangement does not alter the status of the parties nor does it indicate operation or management of the vessel. Such variable costs cannot be accurately estimated in advance under the daily "hire" rate. They depend upon how steadily the vessel is employed, that is, the number of voyages and ports of call selected by the time charterer. Another part of this same clause provides that "when the vessel puts into a port for causes for which [the] vessel is responsible, then all such charges incurred shall be paid by the Owners." This again illustrates the basic responsibility of the owner to operate and maintain the vessel in proper condition. Still another clause in the charter demonstrates the owner's responsibility by providing that if for any cause the full working of the vessel is prevented, "the payment of hire shall cease for the time thereby lost . . .''

The last clause relied upon by appellant provides: "That the whole reach of the Vessel's Hold, Decks, and usual places of loading . . . shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel." This provision is completely consistent with a time charter. The owner has reserved all of the space necessary for the operation and maintenance of the vessel and the rest of the space is available to the charterer for the purposes of the charter.

We conclude that there are no inconsistencies or ambiguities in the provisions of the charter with respect to

the control, operation and maintenance of the vessel and its equipment and that the record clearly establishes that there are no triable issues as between appellant and respondent. The motion for summary judgment was therefore properly granted.

Judgment affirmed.

Kaufman, P. J., and Shoemaker, J., concurred.