[Civ. No. 41757. Second Dist., Div. Four. Feb. 28, 1974.]

ASSISTANCE, INC., Plaintiff and Appellant, v.
TELEDYNE INDUSTRIES, INC., Defendant and Respondent.

**COUNSEL**

Graham & Kuhn and Lewis Graham for Plaintiff and Appellant.

Irell & Manella, Richard H. Borow and Steven L. Sloca for Defendant and Respondent.

**OPINION**

**COLE, J.**\*—Plaintiff-Appellant Assistance, Inc. (Assistance) is the owner of the vessel *Willis Shank.* On October 5, 1967, but as of September 15, 1967, Assistance, as owner, entered into a bareboat charter agreement with Geophysical Aero-Marine Services, Inc. (GAMS). On September 15, 1967, GAMS entered into a time charter agreement with "Geotech, a Teledyne company." The latter's correct name is apparently Teledyne Industries, Inc. We will refer to it as Geotech. In the last mentioned agreement GAMS was designated as "owner" and Geotech as "Charterer."

The object of the charter was to conduct geophysical seismic surveys off the coast of Southern California.

On November 3, 1967, during the times of the subject charters and while running a survey, the *Willis Shank* grounded upon the Hyperion Outfall sewer, a fraction of a mile offshore from El Segundo, California. At the time the ship was in command of a captain employed by GAMS and all of the ship's personnel (as opposed to survey personnel) were on the payroll of, and paid by, GAMS.

Assistance brought an action against Geotech and others not involved here. It recovered judgment against GAMS and an insurance company codefendant for $115,000 in property damage to the vessel, $82,500 for loss of use of the vessel, and $2,065 for missing personal property which had been on the vessel but which was not returned to Assistance. The property damage portion of the judgment was satisfied.

The trial court granted Geotech's motion for nonsuit, apparently at the close of plaintiff's case.[1] Assistance appeals from the judgment of nonsuit.

---

\*Assigned by the Chairman of the Judicial Council.

[1] The order granting nonsuit was not signed until the same day that the jury returned its verdict against other defendants, but the formal order for judgment of nonsuit recites that the motion was made after plaintiff rested its case. The appeal is taken by a so-called settled statement (which in actuality appears to be an agreed statement) as to a portion of the facts.

## ISSUES

Insofar as relevant to our determination of this matter, the issues raised are:

(a) Whether Geotech was a demise charterer or a time charterer; and

(b) Whether GAMS was an agent of Geotech so as to subject the latter to liability for GAMS' negligence.[2]

### The GAMS'-Geotech Agreement
### Is a Time Charter Agreement
### As a Matter of Law

█ Conceding the proposition that a time charterer cannot be held liable under maritime law for negligence in navigation, Assistance seeks to avoid the effect of its concession by arguing that the GAMS-Geotech agreement, while denominated as a time charter, was, in fact, a demise or bareboat charter.

█ The distinction is important because in the latter type of agreement the charterer "takes over the ship lock, stock and barrel, and mans her with his own people. He becomes, in effect, the owner *pro hac vice.*" (Gilmore & Black, The Law of Admiralty (1958) pp. 170-171.) As such owner the demise charterer may be liable to others for damages caused by negligence. But see, e.g., *Apodaca* v. *Schiffahrtsgesellschaft De Vries & Co.,* 199 Cal.App.2d 605, 608 [18 Cal.Rptr. 869].

█ To support its argument that the agreement between Geotech and Assistance was a demise charter, the latter discursively discusses evidence having to do with the circumstances under which the two charter agreements involved here came into being. In this discussion Assistance never makes it clear, at least with respect to the terms of the agreements, the basis for its argument that Geotech became an owner *pro hac vice* of the *Willis Shank* rather than a mere time charterer. The apparent thrust of the argument is that Geotech approved the vessel as a proper one for its seismic survey project before GAMS undertook to enter into what is concededly a demise charter for the boat with Assistance.

---

[2]As a preliminary matter Assistance appears to raise a subsidiary question as to whether maritime law does or does not apply in this action. In its opening brief, citing *Teahan* v. *Industrial Acc. Com.,* 210 Cal. 342 [292 P. 120], Assistance states that a tort is not maritime if the injury is not consummated on or near navigable waters. That case, however, is totally factually inapposite, involving a wharfinger employed by the City of Oakland, who was injured when he boarded a vessel tied to the dock in order to secure some papers. The rationale of the decision was that he was a land employee performing a non-maritime contract.

It also cites *Nippon Yusen Kabushiki Kaisha* v. *Great Western Power Co.,* 17

Whether or not all of the evidence on this subject was admitted against Geotech is not clear.[3] Assuming that it was and assuming that Assistance relied on that fact before entering into its demise charter agreement with GAMS, the nature of the agreement between GAMS and Geotech is in no way altered. The basic contention seems to be that Geotech obtained rights in its agreement with GAMS which converted it into an owner as opposed to a charterer. Examination of the agreement and the circumstances shows that this is not so as a matter of law.

The time charter agreement provides, among other things: (paragraph 2)—that GAMS warrants that the vessel "will be tight, staunch, seaworthy and well equipped, and that thereafter [GAMS] will use due diligence so to maintain it."; GAMS further agreed to, (paragraph 3)—"employ and pay the wages of a master, a mate, an engineer, cook, two seamen, and a mess boy as crew."; Geotech was given the exclusive use of the vessel during the duration of the charter, in turn for which it agreed to pay a specified sum of money. Geotech also agreed to pay to GAMS the cost for certain alterations made necessary for the installation of Geotech's surveying equipment, and retained ownership of its property placed on the vessel by Geotech.

The agreement further provided: (paragraph 11)—that GAMS' "master shall be in complete charge of safety" of the ship "and the master designated by [GAMS] shall act as an agent of [GAMS]. The master shall comply with orders and directions given by [Geotech] . . . as regards the employment of said vessel, except that the master shall have authority to refuse to place the [vessel] in waters or areas which in his opinion would be dangerous either to the vessel or to those aboard the vessel." Geotech

---

F.2d 239, 240, an action involving damage to an electric cable submerged in San Francisco Bay. The Court of Appeal held that the power company's action for damage to its cable did not sound in admiralty, but it also pointed out "that the ship may always claim her damage in the court of her domain for injury done to her" by the land structure. (17 F.2d at p. 240.) In its reply brief Assistance continues to urge that California law may be applicable.

Having raised these issues Assistance concedes that it might be wrong and states in its brief that it concurs that federal maritime law governs the construction of maritime contracts in state court actions, and that the time charter agreement between GAMS and Geotch is a maritime contract. That this concession is correct is required by the cases. (See e.g., *Garrett* v. *Moore-McCormack Co.,* 317 U.S. 239, 245 [87 L.Ed. 239, 243, 63 S.Ct. 246], and *Intagliata* v. *Shipowners & Mer. etc. Co.,* 26 Cal.2d 365, 371 [159 P.2d 1].)

[3]At one point in time the trial court struck some testimony which related to conversations between representatives of GAMS and Assistance. It is not clear exactly which testimony was stricken. Since this is an appeal from a nonsuit judgment we will assume against Geotech that all of the evidence relied upon by Assistance was properly in the record.

was given the run of the ship reserving only designated space for the master and engineer. Finally, the agreement provided that: (paragraph 17)— "should the conduct or actions of a crew member be such that his dismissal becomes necessary, [GAMS] agrees to dismiss and replace the crew member when so requested by a supervisor of GEOTECH."

A demise is created when the owner of a vessel completely and exclusively relinquishes the possession, command and navigation of it. Anything short of such a transfer is a time or voyage charter party or is not a charter party at all. (*Guzman* v. *Pichirilo* (1962) 369 U.S. 698, 699-700 [8 L.Ed.2d 205, 207-208, 82 S.Ct. 1095, 1096]; see also *Larson* v. *Lewis-Simas-Jones Co.*, 29 Cal.App.2d 83, 90 [84 P.2d 296]; *Johnson etc. & Co.* v. *Goodwin,* 68 Cal.App. 363 [229 P. 708].) If the owner is responsible for keeping the vessel in good condition during its life or if the owner supplies the master and crew it is not likely that there has been a demise charter. The mere fact that the charterer has some control over the master or that the charterer selects the route to be taken or the cargo to be carried does not make him the owner *pro hac vice.* (*Fitzgerald* v. *A. L. Burbank & Co.,* 451 F.2d 670, 676 [14 A.L.R.Fed. 525].)

The agreement in question, as noted above, obligates GAMS to keep the vessel in good repair during the life of the charter and to supply the crew. The fact that GAMS entered into a bareboat charter with Assistance only because it contemplated, or in fact already had, entered into an arrangement with Geotech for the time charter does not of itself affect the GAMS-Geotech relationship. It is most clear from the facts that GAMS did not completely and exclusively relinquish possession, command or navigation to Geotech. The fact that Geotech could request GAMS to dismiss a crew member does not change the situation. (*The Volund,* 181 F. 643.)

Assistance further argues that, because it was a Geotech employee who gave general instructions as to where the surveying was to take place, and because that employee may have been left alone in the pilot house at the time the ship grounded, Geotech had possession, navigation and command of the vessel. Even if it were the fact that Geotech and only Geotech was actually piloting and commanding the ship and was without the aid or assistance of any of GAMS personnel (an assumption totally belied by the settled statement on appeal), liability for negligence in navigation would still be that of GAMS and not that of Geotech. In *The Volund, supra,* the ship's captain was not even on board at the time of the collision there involved. The ship was being commanded by a super-

cargo who was an unlicensed officer and who was employed by the *time* charterer pursuant to the terms of the agreement there involved. Nevertheless, under maritime law, it was the owner, not the time charterer who was responsible for the accident. (181 F. at p. 666.)

This principle remains the maritime law of the United States. (*Delaware River Terminals, Inc.* v. *M/S Ancora,* 253 F.Supp. 884, 886.) Referring to language in *The Volund* that "'the navigation of the ship during the time of the charter is in the hands of the owner,'" the court in *Delaware River* made an exhaustive survey of opinions which had intervened from the date of the decision of *The Volund* in 1910 to its own decision in 1966, and stated that the authorities "unerringly fasten liability on the owners, to the exclusion of the charterers." (253 F.Supp. at p. 886.) In the process of examining all of the intervening decisions the court did not find a single statement derogating from the stated principle. Accordingly, and proceeding in a manner analogous to a summary judgment, the court granted the motion of a time charterer to be discharged as a party respondent. Our further research has disclosed no deviation from this rule.

### Geotech Is Not Liable Under Agency Principles

Assistance also argues that, if the agreement between GAMS and Geotech is not a demise charter, Geotech remains liable for GAMS' negligence in any event, by reason of an actual or ostensible agency relationship between the two.

The basis for this argument is the testimony, adverted to above, that GAMS would not have chartered the vessel from Assistance if it had not had Geotech available as its own customer for the time charter; that Geotech's personnel approved the *Willis Shank* as a proper boat before GAMS chartered it from Assistance; that Geotech inferably was in command because of its right to direct the course of the charter and control the whereabouts of the vessel; that Assistance's president testified that he would not have chartered the vessel to GAMS if Geotech had not been in the picture; and finally, that Geotech officials, when questioned about GAMS' "financial lightness" said that GEOTECH "was to pay GAMS and they would see to it that it got to us, and if it didn't to let them know and not to worry about it."

None of these matters, and again we assume that they were all admitted into evidence against Geotech, are sufficient to establish GAMS as Geo-

tech's agent in the context of the maritime law situation which was here involved.

■ ". . . [I]n general, under a time charter, crew and officers are employees of the shipowner and the shipowner acts as an independent contractor in relation to the charter. Doubtless the shipowner and charterer, in their time charter party, could express a different intent so clearly that, with respect to a certain activity, the shipowner would act as agent of the charterer and thus make the shipowner's employees sub-employees of the charterer. Our question is whether there was evidence to go to the jury that that had been done in this case." (*Bergan* v. *International Freighting Corp.*, 254 F.2d 231, 233.)

See also *Klishewich* v. *Mediterranean Agencies, Inc.*, 302 F.Supp. 712, 713: "A time charterer assumes no liability flowing from the unseaworthiness of the vessel or negligence of the crew unless it is shown that the parties to the charter intended otherwise. . . ." and *Mondella* v. *S. S. Elie V*, 223 F.Supp. 390, 393.

■ If ordinary principles of law were applicable to this case it would be more arguable, in the context of the scope of review of a judgment of nonsuit, that enough inferences existed to support a finding that, despite its status as a time charterer, Geotech could be held liable for any negligence of GAMS, on the grounds that GAMS was Geotech's agent. To reach such result, even in a common law context, however, we would have to determine that the inferences to be drawn from the testimony recited above were something more than mere surmise and conjecture. We confess great difficulty in finding that an agency relationship was established even in the ordinary situation. Aside from the time charter agreement itself, and the one statement by Geotech's officer in response to a question about GAMS' "financial lightness," there is no evidence of any dealing between Geotech and GAMS which would cast the role of actual principal on Geotech and that of agent on GAMS. And only the "financial lightness" statement would be looked to if ostensible agency was relied upon since that is the only manifestation by Geotech to plaintiff which possibly could support an inference of agency.

When these facts are considered in the context of the federal cases, some of which we have quoted above in this opinion, as to the relationship between a shipowner and a time charterer, we are fortified in our conclusion that GAMS was not Geotech's agent. Applying maritime law as we must. (*Intagliata* v. *Shipowners & Mer. etc. Co., supra,* 26 Cal.2d 365),

and given the federal requirements (1) that any different intent must be expressed "clearly" (*Bergan, supra,* at p. 233) and (2) that the mere fact a charterer is liable for some expenses is insufficient to render the shipowner his agent (*ibid.*) then it results that no evidence supports the existence of an agency relationship.

The judgment is affirmed.

Jefferson, Acting P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 24, 1974.