## THE PROFESSOR MORSE.

*(District Court, D. New Jersey. May 8, 1885.)*

1. ADMIRALTY JURISDICTION—LOCALITY AS TEST.
   In all cases of maritime torts the locality of the act is the test of admiralty cognizance; and whether the court has jurisdiction in any case depends upon whether the wrong and injury complained of was committed on the high seas, or navigable waters.

2. SAME—INJURY TO MARINE RAILWAY—LIBEL DISMISSED.
   The marine railway claimed to have been injured in this case, as described in the libel, was not at the time of the injury a floating structure, and within the admiralty jurisdiction. *The Plymouth*, 3 Wall. 20, followed, and *The Arkansas*, 17 FED. REP. 383, distinguished.

In Admiralty.

*Bedle, Muirheid & McGee*, for libelants.

*Goodrich, Deady & Platt*, for respondents.

NIXON, J. This is a proceeding *in rem.* The defendant steamer has been libeled for an alleged maritime tort, to the damage of the libelants' marine railway. On the return of the monition the respondents appeared and took three exceptions to the libel filed in the case: (1) Because it did not state facts sufficient to constitute a maritime claim or lien against the vessel; (2) because the court has no jurisdiction to proceed against the vessel in the manner in which the same is sought to be proceeded against by libel; (3) because the alleged injury done to the marine railway and cradle, and the alleged damages resulting to the libelants by reason thereof, were not done, caused, or suffered upon the water and within the ebb and flow of the tide, but were alleged to be done upon the land; and that the court had no jurisdiction in the case.

The libel was filed by the owners of a marine railway at Clifton, Staten island, and state of New York, against the steam-ship Professor Morse, to recover damages sustained in a collision; it being alleged that the railway was injured by reason of the vessel dragging an anchor across the ground-ways thereof, to which anchor she had been fastened against the remonstrances of the libelants. The exceptions, reduced to their ultimate analysis, present simply the question of jurisdiction.

In all cases of maritime torts, the locality of the act is the test of admiralty cognizance, and whether the court has jurisdiction, in any case, depends upon whether the wrong and injury complained of was committed upon the high seas, or navigable waters. It was held by the supreme court in *The Plymouth*, 3 Wall. 20, that in ascertaining whether a tort was maritime or not, it was of no importance that it was committed by a vessel; the locality, and not the character of the instrument which perpetrated the wrongful act, determined the question of admiralty cognizance. Following this case, Judge BLATCHFORD, in *The Maud Webster*, 8 Ben. 547, held that, in applying this criterion of jurisdiction, to-wit, the locality of the tort, we must ascertain the locality of the thing injured, and not of the agent by which the injury is done.

The thing injured, in the present case, was a marine railway. If the offense was committed and consummated on the water, a maritime lien is held to exist, and can be enforced in the admiralty against the vessel; but if upon the land, the only remedy is a common-law action for the tort against the owners. *The Neil Cochran*, 1 Brown, Adm. 162; *The Ottowa*, Id. 356; *The Rock Island Bridge Case*, 6 Wall. 213.

It is therefore necessary to inquire whether the marine railway (the property of the libelants) was, in fact or in law, at the time of the injury, a floating structure, or a part of the land. The libel alleges that it was a marine craft or vessel, and that it was altogether within and under the water of the bay of New York, and within the ebb and flow of the tide. Are there any other allegations which contradict this?

It is then stated that the railway consists of ground-ways laid on piles and loaded with ballasts, but not fastened by any fastening to the piles, and running from the engine-house of said marine railway down to and under the waters of the bay of New York, and out towards the channel of said bay and to the bottom thereof, to a distance of about 700 feet; that said ground-ways are about 13 feet and 6 inches wide,—the flooring thereof resting on the piles and constructed of heavy oak plank; that the track is made of Georgia pine, and runs the whole length of the ways, each track being about 14 inches wide and 12 inches high from the floor; that there are two iron plates on the top of each track, running its whole length, five inches wide and three-quarters of an inch thick, and four inches apart,—making a groove

for the shoulder of each roller to fit in; that on these tracks are a series of rollers set in a roller-box each one being 19 inches long, and so cut as to have a journal 2 inches long at each end, which is set in holes in the roller-boxes; that on the roller-boxes rests a cradle, with heel-blocks and bilge-blocks, capable of removal and substitution at pleasure, on which a ship can be conducted from the water to the shore; that a sheave is fastened to the flooring of the ground-ways under water near the lower end; that an iron cable is attached at pleasure to the in-shore end of the cradle and carried up to a pulley on the shore, and then passed back around the pulley, under the water, to the said sheave on the floor of the ground-ways; that said cradle sits upon the rollers by its own weight, and can be moved back and forth at the will of the engineer; that the roller-boxes with the rollers rest upon the ground-ways by their own weight, and move backwards and forwards with the cradle, but at a rate of only one-half as fast; that the ground-ways, with the exception of one end, are under tide-water, and the cradle, roller-boxes, and rollers traverse and move from the extreme lower end of the ground-ways up through the water until they reach the shore, and that the whole railway is so arranged that the roller-boxes, with the rollers and cradle thereon, can be let down into and under the water in the bed of the bay, and while there a vessel can be floated on the cradle, and placed in position, by means of the keel and bilge-blocks, and pulled to the shore by the chain cable above referred to.

After such description of the railway mechanism, the libel proceeds to state the tort for which the suit is brought, as follows: That on the evening of July 22, 1884, the steam-ship Prof. Morse came to the dock of the libelants for the purpose of being hauled out on said railway to be repaired, and lay along-side of a pier on the north side of the ways, between the ways and the pier, and was made fast by lines in the following manner: one line from her bow to a pile; another line from the foremost chains to another pile, and a spring line from the after-part of the vessel to a pier. That in the water, at some distance north of the steam-ship, was a buoy attached to an anchor, which was used by the libelants to mark a distance from the location of the ways, and to this anchor she made fast another line from the after-part of the vessel; that this was done between 6 and 7 o'clock in the evening, when the libelant John J. Lawler and his brother James were there, who at once remonstrated with the captain against making fast to said buoy or anchor, and told him that the anchor was not put there for any such purpose, but merely for marking an adjusting point for a vessel on the ways, and that if any of his lines parted, the steamer would drift and drag said anchor attached to the buoy down to and under the ways, and destroy them. That notwithstanding this protestation the captain persisted in making fast to said buoy. That at half-past 11 o'clock the same night libelants again went to the steam-ship, and urged the master to remove the line from

the buoy, offered to furnish him with a hawser, and showed him how he could fasten to the pier in such a way as to be safe; but the master declined to accept the hawser, and refused to remove the line from the buoy, or to make fast in any other way. That libelants went there the next morning, and found that the vessel had drifted considerably to the south, and was lying in a quartering position, with her stern over the water, under which the ground-ways were located, and the buoy was on the south side of the vessel, over the ground-ways. That before libelants undertook to haul out the steam-ship, they inquired of the master whether the anchor of the buoy had dragged to the ground-ways, and stated that if it had, it would be unsafe to haul out the vessel, as the ground-ways were probably injured by the dragging of the anchor, and that the captain assured the libelants that the anchor had not touched or injured the ground-ways. That thereupon the cradle and roller-boxes were put in position under the vessel, which was floated upon them; the keel-blocks and bilge-blocks arranged, the engine started, and the cradle and rollers, with the vessel thereon, began the journey towards the shore; that when her prow was six or seven feet out of the water, and the stern was drawing about three feet of water, the vessel suddenly keeled over at the prow towards the north, and carried away the roller-boxes, and the tracks of the ground-ways, and bent the same out of plumb, so that it was impossible to move the rollers, cradle, or vessel either towards the shore or the water, and the whole usefulness of the machine was destroyed. That it required large expense, and 18 days of hard labor, to get the steam-ship off the railway. That the railway was damaged to the amount of $6,500; that the costs of removing the vessel exceeded $2,000; that libelants should be paid demurrage at the rate of $30 a day for at least 120 days; and that all of said damage was caused by the perverseness, negligence, and want of skill and good management of the captain and crew of the said steam-ship, and not from any want of care and diligence on the part of the libelants.

From this description of the structure it can hardly be doubted that it was not, in any proper sense, a craft or vessel intended to float on the water. The upper end was securely fastened to the land,—as much so as a wharf built out into the stream,—and its character is not changed because the ways ran down below the ebb and flow of the tide, to facilitate the transfer of vessels from the water to the shore. The Maud Webster, 8 Ben. 547, was a stronger case for the libelants; but in that case Judge BLATCHFORD, after argument and reargument, dismissed the libel for the want of jurisdiction. The libel was there filed against a schooner for injuries to a derrick and tackle which libelant had erected in Long Island sound, to be used in the construction of a pier for a government light-house. He had built a circle of rip-rap about 70 feet in diameter. The interior was open down through the water to the soil at the bottom of the sea, except where a ring of stone was built up to a line above the surface of

the water. At low water men could stand on the bottom inside of the ring. A temporary derrick was erected, consisting of an upright, the lower extremity of which rested on the soil inside of the rip-rap, and the upright rose through the water and was steadied above by four wire guys, which were extended to a distance, and were anchored to the soil at the bottom of the water outside of the rip-rap. The injury was caused by the schooner striking one of these guys. It was urged that the place where the accident occurred was on the high seas, and not within the limits of any state, and was therefore not on the land; that as it occurred in the midst of the water, it should be considered as having happened upon the water; that the derrick was only there temporarily, and was resting on the bottom of the high seas; that such bottom was not land; and that the property injured should be regarded as personal property upon the water. Judge BLATCHFORD, in his second opinion, after the reargument, said, page 555:

"I cannot regard the injury to the libelant's property as having occurred on the water in the sense of the decisions above cited, although, in one sense, it occurred in the water, because it occurred at a place in the midst of or surrounded by the waters. The property was not in use for purposes of navigation, and was none of it afloat, and was all of it supported by direct pressure on the soil of the earth."

The only case which seems to conflict with this view is the able and discriminating opinion of Judge LOVE in *The Arkansas*, 17 FED. REP. 383. Although not necessary for the decision of the case before him, he distinctly holds that where a structure, whether solid or floating, is lawfully erected in the navigable bed of a river, and is injured by a collision caused by the negligent management of a vessel, the owner of such structure may proceed in an admiralty court by action *in personam* against the owner of the vessel, or *in rem* against the vessel itself. However much I might be inclined, if the question were an open one, to follow this *obiter dictum* of the learned judge, I am constrained, by the authority of *The Plymouth*, 3 Wall. 20, to hold, in the present case, that the libelants have mistaken their court, and that the remedy for the injury complained of is to be found only in the courts of common law. The libel must be dismissed.