THE RUSSELL NO. 6.

THE S. S. CITIES SERVICE MISSOURI.

In re NEWTOWN CREEK TOWING CO.

STANDARD OIL CO. OF NEW JERSEY v. S. S. CITIES SERVICE MISSOURI.

Nos. 15625, 15797.

District Court, E. D. New York.

Aug. 7, 1941.

Alexander, Ash & Jones and Edward Ash, all of New York City, for Newtown Creek Towing Co., and Russell Bros. Towing Co. Inc.

Kirlin, Campbell, Hickox, Keating & McGrann, William H. McGrann, Harold Finn, and Eugene Gilligan, all of New York City, for Standard Oil Co. of New Jersey.

Hatch & Wolfe, Carver W. Wolfe, and Henry P. Elliott, all of New York City, for Cities Service Oil Co.

CAMPBELL, District Judge.

On stipulation the above-entitled petition for limitation and exoneration and suit in admiralty were tried together and as they are based on substantially the same facts one opinion will suffice.

The physical conditions prevailing between 5 and 6 o'clock on the afternoon of October 10, 1938, at the time of the happenings hereinafter described, including the physical land characteristics, the bridges, bend in the Arthur Kills, etc., and the position of the dredge Governor Herrick, are best shown on the Chart, Cities Service Exhibit 1 and Petitioner's Exhibit 3 B, and also on the deposition of petitioner's witness Charles Larkey, as Exhibit 3 A.

There is some conflict in the evidence as to the width of the Channel at the place in question, but I find it to be about 400 to 450 feet. Some of the witnesses in speaking of the Channel, were speaking of the width of the water from the New Jersey to the Staten Island shore, which is somewhat greater. At or about the place in question there is a bend or turn in the Channel, Eastward from South to North.

The tide was flood at the time in question, but there is a sharp conflict in the evidence as to its velocity, the estimates in the oral testimony varying from that of the Pilot of the Missouri of about three knots, to that of the Pilot of the Russell No. 6 of about one mile an hour, but I find that it was about one-half a knot, as shown by the Department of Commerce Certificate.

Visibility was good and the weather clear.

The Missouri, 450 feet over all, and 59 feet beam, left Warner's Dock on the New Jersey shore on October 10, 1938, light, bound for Port Arthur, Texas. She was drawing about 18 feet aft and about 3 or 4 feet forward.

Her Master was in command and on the bridge with Captain Fitzgerald of the Tug Rivere, of the Olsen Towing Company, who was piloting the vessel, and a quartermaster was at the wheel. The Chief Mate, after he finished his work on the forecastle head, came on the bridge, and remained until he left to attend to dropping the anchor, and after that time the Third Mate handled the telephone or telegraph to the engine room. The Missouri proceeded northerly through the Kills at about nine and one-half knots per hour.

The Tug Rivere assisted at the undocking of the Missouri, and was following her.

The Steamtug Russell No. 6, 65 feet long, 20 feet beam, with an indicated horse power of 350, left Schenectady with the Steel barge Russell 23, 230 feet long, 43 feet beam, in tow on hawsers bound for Trembly Point in the Kills. Before entering the Kills the Tug Russell No. 6 picked up the Russell 23 on the tug's port side, made fast so that the bow of the Russell 23 extended about 200 feet ahead of the bow of the tug, and the stern of the tug was about 20 to 25 feet astern of the barge.

The Missouri proceeded up the Kills, and the No. 6 proceeded down the Kills.

There is a conflict in the testimony, but in my opinion the following is sustained by the testimony.

The Russell No. 6 passed under the B & O Bridge over Arthur Kill through the draw on the Staten Island side, which was the general custom as to that particular bridge for vessels going down the Kill bucking a flood tide. About 160 feet astern of the No. 6 was the self-propelled tanker Charles T. Leffler, about 114 feet long, and 24 feet beam, which was proceeding from Passaic, New Jersey, to Perth Amboy, New Jersey, and passed through the same draw.

The Russell No. 6 was making about 2½ miles an hour through the water bucking the tide, which was about 2 miles per hour over the ground, and the Leffler was moving somewhat faster. While between the B & O Bridge and the Goethals Bridge the Leffler sounded a one whistle signal to the No. 6 for permission to pass to starboard, which was answered with one whistle by the No. 6, this may have been what those on the Missouri thought was a one whistle signal to her. The No. 6 and the Leffler proceeded through the Goethals Bridge, the Leffler being astern and to starboard of the No. 6.

The Leffler caught up with the No. 6, which was to her starboard side of the middle of the Channel, at the northward end of Morse Creek, the No. 6 being about abreast of the Leffler on the port side about 150 feet off, when the one whistle signals for a port to port passing were sounded by the Missouri, the No. 6, and the Leffler. Prior to that time the Missouri had sounded a four whistle signal to the bridge to open, but whether the bridge answered is in doubt, but not of importance.

When the one whistle signals were exchanged the engines of the Missouri were stopped, and she was allowed to drift with the flood tide, but she did not go over to her starboard. There is a sharp conflict in the evidence as to whether the Missouri first sounded the one whistle signal, but that does not seem to me to require any extended consideration, as the signal was clearly understood by all of the vessels in question. In any event the No. 6 sounded only one, one whistle passing signal to the Missouri. Immediately after sounding the one whistle signal the No. 6 and the Leffler went over to their starboard side of the middle of the Channel, and the Leffler slowed down because of the Dredge Governor Herrick, which was lying on the westerly side of the Channel. The Missouri at the time she blew the one whistle passing signal was at the lower end of the Gulf Oil Dock, about at an eastward bend or turn in the Channel, and about the middle of the Channel. The Leffler and the No. 6 proceeded down the Channel, the Leffler passing the Dredge about 50 feet off her starboard side, and the No. 6 had narrowed her position from 150 feet to 50 feet off the Leffler when the Leffler was op-

posite the dredge. The Leffler continued on down the Kill, and the No. 6 was about 150 feet astern and 50 feet to starboard of the Leffler when the Leffler passed the Missouri port to port and the Missouri dropped her starboard anchor. The Missouri put her engines full speed astern, but she still had headway, and the Pilot says she sounded an alarm, had his wheel right and tried to pull over toward Staten Island, but she would not do that. The No. 6 and her tow passed the Missouri port to port, and the barge in tow of the No. 6, and the Missouri did not touch at any point.

In fact though the Chief Mate of the Missouri says the barge in tow of the No. 6 and the Missouri passed 2 or 3 feet off each other, the Master of the Leffler and the Pilot of the No. 6 say that the No. 6 passed 100 feet off. It seems clear to me that the Missouri was under no necessity to drop her starboard anchor to prevent her coming into collision with the No. 6 or her tow. If there was any danger of collision by the Missouri, it was with the Dredge Governor Herrick, not with the No. 6 or her tow.

The story told on behalf of the Missouri by the Pilot, and by her Master, is not supported by any of the disinterested witnesses, Larkey, Master of the Charles T. Leffler; Hankin, Superintendent of the Dredge; or Beaghen, night Superintendent of the Standard Oil Company plant at Bay Way.

The Russell No. 6 did not, as contended on behalf of the Missouri, continue making little headway, if any, in any direction, all the time on the starboard bow of the Missouri until about 200 feet ahead of the Missouri, and then shoot across the bow of the Missouri, starboard to port, which had stopped her engine, and gone astern on her engines, and dropped her anchor, nor did the No. 6 pass the Missouri with a clearance of only 5 to 6 feet.

This story clearly is erroneous, what really happened was that the No. 6 went to her starboard after the exchange of the one whistle signals, but because of some peculiar notion of the Pilot of the Missouri as to her right of way, she did not go to her starboard, as she was bound to do, to make her turn up the bend in the Channel, down which the No. 6 was coming, and when the wheel of the Missouri was put to right, which would have taken her to her own starboard, the Missouri, as admitted by her Pilot, "wouldn't make that swing."

This would furnish sufficient reason for dropping her anchor, not to avoid collision with the No. 6, which passed well off the Missouri, but to avoid collision with the Dredge.

The story told on behalf of the Missouri, as to her navigation, is one that appears to me to be so unreasonable that it must be erroneous.

The Missouri was solely and wholly at fault and to blame.

■ The right of the petitioners to limit liability was not contested, and on all the evidence the petitioners' right to exoneration is clearly established.

This brings us to a consideration of the above-entitled suit in Admiralty of the Standard Oil Company of New Jersey against Steamship Cities Service Missouri.

We will first consider the separate and complete defense alleged in the Twelfth paragraph of the Answer, as follows: "Twelfth: That this Court has no admiralty and maritime jurisdiction over the matters mentioned in the libel."

This suit was brought by the libellant to recover damages to certain oil conveying pipe lines, which had been laid in a trench in the bottom across Arthur Kill, between the New Jersey side of the Channel, and the Staten Island side of the Channel, and which it was alleged had been damaged by the negligence of the "S. S. Cities Service Missouri" in dropping her anchor directly on the pipe lines or dragging her anchor and pulling out, and bending four lines.

These pipe lines, which had been partly in existence for some years previously, were relaid under permit issued by U. S. Engineers Department at New York, under date of October 31, 1936.

The pipes existing at the time of the damage on October 19, 1938, consisted of ten 8 inch welded steel pipes, about 18 inches apart, and on parallel lines. The permit to relay the pipes was granted for the reason that Channel of Arthur Kill, which had previously been of a depth of 30 feet, was to be dredged by the Government to a depth of 37 feet. They were directed to be laid 41.75 feet below mean low water, in a trench 40 feet wide, which would and did sink them from 2 to 3 feet below the anticipated dredged bottom depth. The ends of the pipe lines came out on the Staten Island and New Jersey shores to which they were attached. Some question about a requirement for backfilling was

raised, but that is not material on this question of jurisdiction.

The oil that passes through the pipe lines in question first comes to the libellant's refinery at Bayonne, New Jersey, by tankers from the Venezuelan fields, or the East Texas fields, the West Texas, and perhaps the Oklahoma, and California fields. This oil is picked up by the Inter-Refinery Pipe Line Department, and pumped through pipe lines to the Staten Island storage tanks, and then through the pipe lines in question under Arthur Kill to the refinery at Bay Way, New Jersey. Oil is also, after processing, pumped back from Bay Way, New Jersey, after refining to Staten Island through the pipe lines in question, and then to the Refinery at Bayonne, where it is processed and put into cases or into tanks from which some of it is pumped into tankers.

■ Tort jurisdiction in Admiralty depends upon the locality of the injury, or occurrence, and does not extend to injuries caused to persons or property on the land where the State Law is applicable. The Plymouth, 70 U.S. 20, 33, 3 Wall. 20, 18 L.Ed. 125; Johnson v. Chicago & Pacific Elevator Company, 119 U.S. 388, 7 S.Ct. 254, 30 L.Ed. 447; Cleveland Terminal & Valley Railroad Company v. Cleveland Steamship Company, 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508, 13 Ann.Cas. 1215; Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208, 51 L.R.A, N.S., 1157; Grant Smith-Porter Ship Company v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321, 25 A.L.R. 1008.

■ See Hughes on Admiralty, 2d Ed., p. 197, in which he says, "Anything that is attached to the shore, although the water may be beneath it, is considered as a projection of the shore, and torts happening upon such structures are not within the jurisdiction of the Admiralty."

In the following cases it has been held that torts were not cognizable in Admiralty: where damages were caused by a vessel in navigable waters to the land itself or structures thereon such as a warehouse or storehouse, Johnson v. Chicago & Pacific Elevator Company, supra; to bridges, Cleveland Terminal & Valley Railroad Company v. Cleveland Steamship Company, supra; to piers or wharves, The Curtin, D.C., 152 F. 588; to marine railway, The Professor Morse, D.C., 23 F. 803; to a derrick, The Maud Webster, 16 Fed.Cas.

page 1157, No. 9,302; to submarine cables, Nippon Yusen Kabushiki Kaisha v. Great Western Power Co., 9 Cir., 17 F.2d 239, certiorari denied 274 U.S. 745, 47 S.Ct. 591, 71 L.Ed. 1325.

In both Nippon Yusen Kabushiki Kaisha v. Great Western Power Co., supra, and Westfall Larson & Co. v. Allman-Hubble Tug Boat Co., 73 F.2d 200, the Circuit Court of Appeals in the Ninth Circuit denied the libellant recovery in a suit in admiralty where power cables resting on the floor of a bay, which before and after they entered the water were attached to shore fixtures, were fouled or uprooted by the anchor dropped by a vessel.

It is true Admiralty jurisdiction was upheld in cases involving damage to cables by vessels in the following cases in trial Courts: United States v. North German Lloyd, D.C., 239 F. 587; The Toledo, D.C., 242 F. 168; Postal Telegraph Cable Co. v. P. Sanford Ross, Inc., D.C., 221 F. 105; but, none of these decisions ever received the approval of any Circuit Court of Appeals. They were criticized by the Ninth Circuit Court of Appeals in Nippon Yusen Kabushiki Kaisha v. Great Western Power Co., supra.

In the United States District Court for the Western District of Washington, Cushman, J., in The Trinidad, 1932 A. M. C. 1144, refused to follow them, and followed the decision of the Ninth Circuit Court of Appeals in Nippon Yusen Kabushiki Kaisha v. Great Western Power Co., supra.

Jurisdiction in Admiralty was sustained by the Supreme Court in The Blackheath, 195 U.S. 361, 25 S.Ct. 46, 49 L.Ed. 236, where damage was done by a ship to a Government beacon attached to the bottom of a Channel, but that decision did not mean to extend Admiralty jurisdiction to every tort committed by a vessel in navigable waters, as is shown by the decision of the Supreme Court thereafter rendered in Cleveland Terminal & Valley Railroad Company v. Cleveland Steamship Company, supra [208 U.S. 316, 28 S.Ct. 416, 52 L.Ed. 508, 13 Ann.Cas. 1215], where the Court gave the following reason for its decision in The Blackheath, supra: "The damage was to property located in navigable waters, solely an aid to navigation, and maritime in nature, and having no other purpose or function." See The Poughkeepsie, D.C., 162 F. 494, affirmed 212 U.S. 558, 29 S.Ct. 687, 53 L.Ed. 651.

908

Libellant, Standard Oil Company of New Jersey, in above-entitled suit in Admiralty No. 15797, endeavors to distinguish its case from the authorities cited by contending that the pipe lines in question were used for purely maritime purposes, were not fixed to the bottom of the navigable waters in which the damage occurred, and could not be truly said to form part of the shore construction either on the Bay Way side, or on the Staten Island side of Arthur Kill, but were no more than hoses for transfer- ring fluid back and forth, and cites as authority for its contention, New York Telephone Company and New Jersey Bell Telephone Company v. Cities Service Transportation Company, Reading Company, Fred B. Dalzell, et. al., D.C., 23 F. Supp. 426, 427, a case which was brought in this district for the recovery of damage to telephone wires crossing the Kills, the Court in sustaining Admiralty jurisdiction said: "in active use and operation on the part of the libelants for the rendering of telephone message service between the city and state of New York and various points in the United States, and the messages, among other things, related to matters of maritime import."

Without in any way approving of that decision, it is sufficient to say that on the facts in the instant suit it is clearly distinguished from that case. Whether the pipe lines here in question were or were not affixed to the bottom is of no moment. The pipe lines in question were affixed onto the plant on both sides of the Kill, and formed part of the libellant's plant as a whole, which could not have been operated without such pipe lines, unless some other means of sending the oil from Bayonne to Bay Way was provided.

The pipe lines did not perform a purely maritime service. The fact that oil which was pumped through the pipe lines in question found its way into tanks on land, from which some of it was pumped into tankers, did not make the purpose of the pipe lines in question maritime in any other or greater sense than the dock at which such tankers were loaded, a suit for damage to which clearly would not be cognizable in Admiralty.

The defense of lack of jurisdiction as to the suit in Admiralty, secondly above entitled, has been sustained.

A decree may be entered in the Limitation Proceeding, first above entitled, of ex- oneration in favor of the petitioners with costs against the claimants.

A decree may be entered in suit in Admiralty, second above entitled, in favor of the respondent and its claimant against the libellant, dismissing the libel solely on the ground that this Court has no Admiralty and Maritime jurisdiction over the matters mentioned in the libel.

Settle decrees on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion.