## THE PLYMOUTH.

1. Where a damage done is done wholly upon land, the fact that the cause of the damage originated on water subject to the admiralty jurisdiction does not make the cause one for the admiralty.
2. Hence, where a vessel lying at a wharf, on waters subject to admiralty jurisdiction, took fire, and the fire, spreading itself to certain store-houses on the wharf, consumed these and their stores, it was held not to be a case for admiralty proceeding.

THE steam-propeller Falcon, employed by its owners in navigating our great northern lakes, anchored beside the wharf of Hough & Kershaw, in Chicago River; "navigable water." Upon the wharf large packing-houses were built, and these, at the time, were filled with valuable stores. Owing to the negligence of those in charge of the Falcon, the vessel took fire; and the flames, stretching themselves to the wharf and packing-houses, set these last on fire, which with their stores were wholly consumed. Hough & Kershaw filed, accordingly, in the District Court for the Northern District of Illinois, a libel in admiralty, for cause of damage, civil and maritime, against the owners of the Falcon, and attached a vessel of theirs called the Plymouth.

The District Court, regarding the case as not one for the Admiralty, dismissed the libel for want of jurisdiction. The Circuit Court, on appeal, considered that the dismissal was rightly made. The case was now here for review.

It is necessary to say that, by act of Congress,* the District Courts of the United States possess admiralty jurisdiction "in matters of contract and tort arising in, upon, or concerning steamboats or other vessels," on our great northern lakes, the same as they do in cases of the like steamboats, and other vessels employed in navigation and commerce on the high seas and tide-waters.

---

* Act of February 26, 1845; 5 Stat. at Large, 726.

*Mr. A. W. Arrington, in favor of the jurisdiction:*

The question is, has a court of admiralty, jurisdiction to decree compensation for the damage done by the Falcon?

The question, as respects instance at least, is one *primæ impressionis.* We can adduce no precedent identical in its circumstances. Two reasons exist for this:

1. Until a recent period the admiralty jurisdiction was repressed and hindered from attaining its appropriate extension by the jealous interference of the common law courts, in England, and by the servile adoption of the English rule, without comment or qualification, in America. That rule excluded the jurisdiction, not only from all waters unaffected by the ebb and flow of the tide, but even from tide-waters within the body of a county. Hence, during the prevalence of such a rule, no case like the present could arise; because, ships could not be the means of setting fire to wharves or houses, without penetrating the body of some county, and then, *ipso facto*, admiralty jurisdiction would be excluded by the English rule.

2. The local distance betwixt the sites of houses and the possible anchorage of vessels, in most parts of the world, prevents, *ex necessitate*, the existence of an occurrence like the one in controversy. It is only at Constantinople, in the Golden Horn; in the harbor of Chicago; and in a few other favored ports of the world, that, in the beautiful language of Gibbon, "ships may rest their prows against the houses, while their sterns are floating in the water."

But the objection that this case is the first of its kind, must be pronounced invalid, in the light of leading decisions of this court. The same objection was urged, with all the weight which learning and eloquence could give it, against those very adjudications which have now become fixed in admiralty law, and was urged in vain; while, at the same time, those adjudications overruled the supreme authority of prior cases, and cases seemingly established among the most permanent doctrines of Federal jurisprudence. Thus, in the *Thomas Jefferson,** in 1825, this court held that the

* 10 Wheaton, 428.

admiralty jurisdiction was confined " to the sea, or waters within the ebb and flow of the tide."

In *Peyroux* v. *Howard** this doctrine of the former case was approved; the court deciding that if one *terminus* of a voyage was above the flow of tide-water, the mere fact precluded the exercise of jurisdiction. The law of these cases was followed by all the district and circuit courts. The firmness of an enduring principle seemed to have been obtained. In truth, the structure wanted but one thing to insure its permanence,—rational accordance with the spirit of the age and nation, as developed by the characteristics of the physical geography of America.

In 1848, in *Waring* v. *Clarke*,† the Supreme Court took its first step in a path divergent from the *via trita* of the ancient English rule, by adjudging that admiralty had jurisdiction in a case of collision, though happening *infra corpus comitatus*. This was the germination of a new idea. But the full development of reason was reserved for the year 1851, when, in the *Genesee Chief* v. *Fitzhugh*,‡ this same tribunal shook off the yoke of English authority forever, by declaring that " tide-water" constituted no proper test of admiralty jurisdiction. That case has been succeeded by a series of judgments, which established the true criterion of jurisdiction as being " navigable water" *per se*, in contradistinction to water not navigable, and to nothing else. Now, the case of the *Genesee Chief* was the first of its kind. There had been nothing like it, either in England or America, since the days of Lord Coke. It was not only a novelty, but one in clear contradiction of all previous authority.

The objection, therefore, has been overruled in advance.

It must be noted, *in limine*, that the present case, although new in the instance, is not so in principle. On the contrary, the inference we seek to deduce is the logical result of doctrines as old as the common law; and is confirmed, besides, by the analogy of adjudged cases.

*First.* Let the court consider the nature and character-

---

* 7 Peters, 324.          † 5 Howard, 441.          ‡ 12 Id. 443.

istics of the two things concerned in the case of damage,—
the object injured, and the agent causing the injury.

I. The object, or part of the object, injured—the wharf—
was unquestionably a maritime thing. A wharf is the ne-
cessary *terminus, a quo* and *ad quem*, of every voyage, in cer-
tain lines of trade; and becomes thus indispensable to com-
merce and navigation. It is an instrument of navigation.
And it has been decided that the lien of a wharfinger apper-
tains to the jurisdiction of the admiralty.* It has even been
adjudged that the owner of a shipyard, who employs a rail-
way cradle and other fixtures for hauling vessels out of the
water, can sue in the admiralty for his services, though the
repairing may be done by other parties.†

II. The agent producing the damage, the vessel which
communicated fire to the wharf, was a maritime thing. That
fact is conceded.

Hence, since both the object and the agent were maritime
things, and within the admiralty jurisdiction, would it not
shock common sense to exclude from that jurisdiction the
injury received by one from the other, in a case of manifest
and admitted tort?

III. The locality was maritime. The ship, the maritime
agent, in the very act of committing the injury, was moored
in a maritime place, namely: in "navigable water." And
this court has determined that "navigable water" is the test
of admiralty jurisdiction, in cases of tort.‡

IV. Another legal principle, in connection with the pre-
ceding, covers the case.

The principle is this: That the incident, or that which is
accessary, always follows, or is drawn to, the principal thing
in a given combination of circumstances. Or, as the maxim
is announced by Lord Coke,§ "*accessorium non ducit sed sequi-
tur suum principale.*"

The maxim has been applied to the admiralty jurisdiction

---

* Johnson *v.* The McDonough, Gilpin, 101.
† 2 Parsons on Maritime Law, 639.
‡ Jackson *v.* The Magnolia, 20 Howard, 301, 302.
§ Coke Littleton, 152 *a.*

in cases reported by Croke, Levinz, Comberback, Saunders, and others,* and always to this effect: " That when the principal cause is within the jurisdiction, there is also juris diction over the incidents."

In a case in Siderfin† a suit was sustained in the admiralty for beaconage, of a beacon standing on a rock in the sea, for the reason that the admiral had jurisdiction of beacons, although the rock was part of the earth and appertained to the inheritance.

All these are common law cases, running back, too, to the cradle of the system; and they all concur to establish the point ruled, at a later period, in *Le Caux* v. *Eden*:‡ " That when the admiralty has jurisdiction of the original matter, it ought to have jurisdiction of everything incidental."

Hence, the question is, what was the principal matter or thing in this case of damage? What was the original, or, in the language of the schoolmen, the *efficient*, cause of the injury? The answer is: The original cause was the ship; or, rather, the ship in action, and performing a wrongful deed to the damage of others. The composition or chain of causes and effects is simple, being constituted by six links:

1. The ship, a maritime thing, and within the admiralty jurisdiction.

2. The inception of the fire, through the negligence of the master and crew, a maritime wrong, and also clearly within the jurisdiction.

3. The wharf, a maritime thing, and alike within the jurisdiction.

4. The communication of the fire to the wharf.

5. The communication of the fire to the packing-house.

6. The destruction of both the wharf and the packing-house.

Such was the *series implexa causarum*, in logical as in chro-

---

* Radley *v.* Egglesfield, 2 Saunders, 259 *e; S. C.* 2 Levinz, 25; 1 Ventris, 173, 174; Anonymous, Id. 308; Anonymous, Croke Elizabeth, 685; Tremoulin *v.* Sands, Comberback, 462.

† Crosse *v.* Diggs, p. 158.

‡ Douglas, 580.

nological order. The ship, or the tortious act of the ship, we repeat, was "the original matter, the principal thing," the efficient cause, in the case of damage; and the destruction which followed, in natural sequence, was the incident. If this be so, then, according to all the authorities, the whole case is within the admiralty jurisdiction.

This conclusion, too, is in harmony with scientific theory. It is a law of positive philosophy, that every action in nature derives its specific character and denomination from the agent or principal cause, and not from the object or mere passive thing affected by the action.. In a philosophical sense an action is a mere abstract idea, and, in the concrete, means nothing more than an agent acting in a particular manner.

Then, if a tort be perpetrated by a maritime agent, through the instrumentality of a maritime thing, and in a maritime place, must not the tort itself be maritime? To hold otherwise would not only render the law discordant with the beauty of scientific thought, but absurd to common apprehension.

Finally, under this head, it has been determined by this court, that it is sufficient for the agent or principal thing to be maritime, to bring the case within the jurisdiction of the admiralty, although the other thing concerned did not appertain to such jurisdiction. In *Fretz* v. *Bull** it was decided that the jurisdiction attached as against a steamer, by the fault of which a flatboat (of itself, not the subject of admiralty jurisdiction), was sunk in the Mississippi.

*Second.* This case is a mixed one; and in "mixed cases," arising partly on land and partly at sea, or upon "navigable waters," admiralty has jurisdiction.† Here the wrongful action of the maritime agent commenced upon "navigable water," and was continued to its consummation upon the shore.

*Third.* The same inference is supported by the analogy of prize cases, in which, even in England, "the jurisdiction

---

* 12 Howard, 466.     † United States *v.* Coombs, 12 Peters, 72, 76.

Argument in favor of the jurisdiction.

depends, not on locality, but on the subject-matter."* The reason of the difference between the respective jurisdictions of the prize and instance courts, in England, arose from the fact that the judges of common law never attempted to restrain the jurisdiction of the admiralty prize court, as to the land; nor to control it by the principle of locality.

*Fourth.* We claim no more, in this case, than belonged to the admiralty before the jealousy of the common law courts had curtailed its jurisdiction. This, in the language of the commissions to the admiralty judges, comprised "all injuries done upon public rivers," and "upon the shores and banks adjoining them."† In the time of the Commonwealth, the jurisdiction included "all cases of prejudice to the banks of navigable rivers," or to "the docks, wharves, quays," or anything whereby shipping may be endangered.‡

*Fifth.* The jurisdiction of our colonial vice-admiralty courts was equally extensive, including "all trespasses and injuries, between owners of ships and other persons, done upon the shores of public rivers."§

*Sixth.* The general maritime law of continental Europe regards only the character of the transaction, and therefore extends to all cases of service, contract, tort, or accident, "relating to ships, shipping, and marine commerce."||

Can a reason be assigned why the jurisdiction of the American admiralty should not be as broad and beneficial as that of any system of cultivated justice? We are not bound in fetters, by the constitution, to the English rule. If we break the constitution by departing from the English rule, we have already broken it into atoms. We broke it when we suffered the jurisdiction to penetrate into the body of a county. So we broke it when the limit of tide-water was discarded, with the sovereign arbitrament of the moon. 'And we broke it again, when admiralty jurisdiction was applied to revenue cases.

---

* Brown's Admiralty, 208.        † De Lovio *v.* Boit, 2 Gallison, 452 *n.*

‡ Benedict, § 107.              § Id. § 151.

|| Id. § 211.

On the other side, there is but one thing to be said, namely, "that in cases of tort, the jurisdiction depends on the locality of the act done, and that it must be done on navigable water." This is properly denominated the "rule of locality."

Now we submit that a bare inspection of the terms comprising the rule shows it to be ambiguous. It may mean that the agent acting must be on navigable water, or that the object must be on navigable water; or that both the agent acting and object acted upon must be on navigable water, and that the total effect must be there too.

But no case has ever so defined the rule of locality as to restrict it to the two latter suppositions. No lawyer ever intimated that both the agent and object must be on navigable water at the time when a tort is committed.

The truth is, that all general rules, all definitions in sciences, other than the mathematical, are what logicians call *dicta secundum quid;* in other words, are postulated with a qualification. It is only in the strict mathematics that the subject can take the place of the predicate, and *vice versâ,* by the change of simple conversion. And especially all legal propositions are *secundum quid* with respect to the cases upon which they are founded.

Let us then see what are the cases adduced in support of the rule of locality.

In *Thomas* v. *Lane,** a circuit case, the libel was for a tort committed by the master of a vessel upon a mariner. And it was decided that the admiralty had no jurisdiction, because the libel did not allege the trespasses to have been committed on tide-water; while a part of the charge, to wit, the imprisonment, was expressly stated to have been on shore, in the port of Havana. In delivering the opinion, Story, J., said: "In regard to torts, I have always understood that the jurisdiction of the admiralty is exclusively dependent upon the *locality of the act.* The admiralty has not, and never, I believe, deliberately claimed to have, any jurisdiction over

* 2 Sumner, 9.

torts, except such as are maritime; that is, *such as are committed* on the high seas, or on waters within the ebb and flow of the tide."

Here we have the "locality of the act" as the test of jurisdiction, and the circumstance that such act must "be committed on waters within the ebb and flow of the tide," as the explication of the test.

But what were the facts of the case which called for the application of the rule? The case was, that both the agent of the wrong and the object that suffered it were on the shore. The imprisonment was on the shore. The entire act of causation, as well as the entire effect, was on the shore.

If the master, in *Thomas* v. *Lane,* had stood on the deck of his ship while the mariner was chained on the adjacent shore, and had scourged his victim with a long whip, the case would be analogous to ours. But, in such a case, would any court of admiralty in the civilized world have refused to entertain jurisdiction?

But what is the *locality* of an act? The term needs a definition, and this court must supply the need; for you will search the books in vain for anything approximating the *desideratum.* Where, then, is the locality in question? Is it where the agent acts? Or is it where the object is affected? According to science and common sense, it is both conjointly, and neither exclusively. The locality of an act embraces the entire space occupied by the agent and the object, and the spatial distance passed over by the causal influence in accomplishing the effect. Who shall declare the locality of a battle? Is it at the spot where the cannon stands? Or at the spot at which the ball that issues from it strikes its victim? In neither. The locality is the entire field. Where is the locality of the sunbeam? In the mighty orb from which it parts? or in the boundless track through which it passes? or on the earth which it animates with life, and health, and warmth? In no one, assuredly, alone. All are but parts of one stupendous whole; spreading undivided, and which operates unspent.

In *United States* v. *Coombs*,\* the rule of locality was announced, by this court, with a qualification. The indictment was for stealing a quantity of merchandise belonging to a ship cast away on the shore of New York. The goods were taken above high-water mark on the beach in Queen's County. The indictment was sustained under the constitutional power to regulate commerce. But the court denied that it could be sustained as falling within the admiralty jurisdiction. Of course, they denied that; because both the agent and object were on the shore. The thief stole the goods on the shore above high-water mark. Story, J., delivering the opinion, said: "Our opinion is, that in cases purely dependent upon the locality of the act done, admiralty jurisdiction is limited to the sea, and to tide-waters as far as the tide flows, and that it does not reach beyond high-water mark. Mixed cases may arise, and, indeed, often do arise, where the acts and services done are of a mixed nature; as where salvage services are performed partly on tide-waters and partly on the shore, for the preservation of the property saved; in which the admiralty has constantly exercised jurisdiction to the extent of decreeing salvage." And he adds: "If the libel is founded on one single continued act, which was principally on the sea, though a part of it was upon the land, as if the mast of a ship be taken upon the sea, though it be afterwards brought ashore, no prohibition lies."

Now, as we have already submitted, ours is a mixed case. The efficient cause was on navigable water. The negligence was there. The act of wrong was committed there. Whatever power for injury the ship possessed originated there, and was exerted there. The ship did not go on shore, the master and mariners did not go on shore, to commit the offence  The principal thing, the act of negligence, the destroying agency, was on navigable water, was within the admiralty jurisdiction; and only the incidental effect was produced on the shore.

---

\* 12 Peters, 72.

*United States* v. *Davis*,* a case like *Thomas* v. *Lane*, of circuit ruling only, and not authoritative therefore, may be thought to be opposed to our view. The facts were these. A gun was fired on an American ship lying in the harbor of one of the Society Islands, by which a person on board a schooner belonging to the natives was killed. "*Held*, that the act was, in contemplation of law, done on board the foreign schooner where the shot took effect; and that jurisdiction of it belonged to the foreign government, and not to the courts of the United States, under the Crimes Act of 1790."

A similar case is that of *United States* v. *McGill*.† The facts were, that the prisoner, the mate on the brig Rover, in the harbor of Cape François, gave the deceased a mortal stroke with a piece of wood. The latter was carried on shore alive, and died the following day. The prisoner's counsel made the point, that both the death and blow must happen on the high seas, to give the court jurisdiction under the act of Congress. The court so decided, for the reason that the act of Congress applied only to murder on the high seas, and because the term murder, *ex vi termini*, implied death.

Both these were criminal cases, and the decisions are in accordance with the technical distinctions of the ancient common law. For under that, by a strange absurdity, "if an offence was commenced in one county, and consummated in another, the venue could be laid in neither, and the offender went altogether unpunished." And so if the blow was given on the land, and the death happened on the sea, and *vice versâ*, neither the courts of common law, nor the admiral's court had any jurisdiction of the crime.‡

This ridiculous *non sequitur* resulted, according to Blackstone, from the technical formula prescribed for the grand jury, since they were only to inquire *pro corpore comitatûs*. Thus, if the blow happened in county A., the grand jury of county B. could not inquire of that; and if the death happened in B., the grand jury of A. could not inquire of that.

---

* 2 Sumner, 482.                                    † 4 Dallas, 426.

‡ 1 Chitty's Criminal Law, 177, 180.

And the same logic applied with equal force to the land and sea.

This species of reasoning, or rather, this *reductio ad absurdum* of the reasoning process itself, was in perfect accord with the philosophy of the age. It was the age of the scholastic philosophy—an age of *dicta* and *contradicta*—an age when the highest human ingenuity was perverted to inquiries respecting the eternal puzzles that lie beneath the basis of all finite knowledge; when the mightiest minds sought to postulate the difference between entities and quiddities; when the all-engrossing questions were, whether angels existed in or out of space? And, if in space, how many angels could dance on the point of a needle? And whether the Deity loved an actual entity of the lowest grade better than a possible entity of the highest?

This was the philosophy in vogue when the common law distinctions. as to venue were fabricated. And the law always derives the methods of its logic from the philosophical character of the time when it is elaborated.

The reasoning of the early English courts on the subject of venue was nearly akin to the old Eleatic demonstration as to the impossibility of motion. "If a body moves at all," argued Zeno, "it must either move where it is, or where it is not: but it cannot move where it is; and surely it cannot move where it is not; *ergo*, it cannot move at all." And the only answer to the logic that all antiquity could make, was given by Diogenes, who got out of his tub, and walked.

By the same process of reasoning that the English courts employed to exclude the jurisdiction when the blow was struck in one county, and the death happened in another, it is easy to prove that the man was not killed at all. Thus, if this man was killed at all, he must have been killed at some particular place: but he was not killed at any particular place; therefore, he was not killed at all. Or thus: If a man is killed at all, he must be either killed on the land or sea; but this man was not killed on the land, because the mortal blow was not given there, but on the sea; and he was not killed on the sea, because he did not die there, but

on the land: therefore, he was not killed at all. There you have as good a demonstration as the schoolmen ever uttered.

And that is the precise argument, *mutatis mutandis*, that is urged against the admiralty jurisdiction in the present case.

But is this a case, is this an age, is this the court, for the prevalence of such parodies on all scientific ratiocination? Contrariwise, is not this rather a case for the exercise of that kind of logic which appertains more to the enlarged policy of the most enlightened and liberal statesmanship than to the technical quibbles of puerile and perverted dialectics? For, whatever reasons justify the admiralty jurisdiction in any case, must justify it in this. Upon what reason is the jurisdiction founded? Is it the necessity for process as speedy as the hoisting of the sails; that shall go at once *velis levatis*, as Lord Mansfield worded it? That reason exists in such a case as this. Or is it the necessity for a tribunal thoroughly versed in maritime laws and usages? That reason exists here. And as we have shown, there is nothing opposed to · the jurisdiction in this case, but a false and preposterous construction of the rule of locality, and which has not the sanction of a single authoritative case.

We do not ask the court to amplify the jurisdiction of the admiral; we but ask it to deduce from his original jurisdiction that which is logically and consequentially involved. If any continent exists entitled to have the jurisdiction amplified to its full extent it is ours,—a continent which, by distinction from all others, may be called the continent of waters,—a continent covered by mighty rivers and majestic lakes. Though not subjects of admiralty jurisdiction, as once understood here and as still understood in England, we have been compelled to bring these under such control. It is fitting that the further development should come from the region of these great waters; which has thus already cast the rich hues of its western sunlight upon the east. The necessity of a power to administer justice speedily and surely is great; and will become greater with the incalculable expansion of trade and commerce on the western lakes and rivers. The vessel which has done the wrong speeds away,

and with the winds and currents is carried thousands of miles from the scene of the wrong she has done. Why send the injured suitor to a distant State in order to have redress?

The ultimate question reverts. Will you be fettered in the freedom of your judicial action by a fiction of the scholastic ages, or yield to the force of a present reality? Will you follow the example of the most enlightened continental jurisprudence, and which is in harmony with the physical geography of this grand new world; or will you cling with servile submission to the petty precedents of little England, whose people, beyond all people, are individual and local in their views, and in more senses than one remain the " *penitus toto divisos orbe Britannos ?*"

*Mr. Spalding, contra.*

Mr. Justice NELSON delivered the opinion of the court:

The court below dismissed the libel for want of jurisdiction; and that question is the only one that has been argued in this court.

It will be observed, that the entire damage complained of by the libellants, as proceeding from the negligence of the master and crew, and for which the owners of the vessel are sought to be charged, occurred, not on the water, but on the land. The origin of the wrong was on the water, but the substance and consummation of the injury on land. It is admitted by all the authorities, that the jurisdiction of the admiralty over marine torts depends upon locality—the high seas, or other navigable waters within admiralty cognizance; and, being so dependent upon locality, the jurisdiction is limited to the sea or navigable waters not extending beyond high-water mark.

In the case of *Thomas* v. *Lane*,* Mr. Justice Story, in a case where the imprisonment was stated in the libel to be on shore, observed: " In regard to torts, I have always understood that the jurisdiction of the admiralty is exclusively dependent upon the locality of the act. The admiralty has

---

* 2 Sumner, 9.

not, and never, I believe, deliberately claimed to have, any jurisdiction over torts, except such as are maritime torts; that is, torts upon the high seas, or on waters within the ebb and flow of the tide." Since the case of the *Genesee Chief*, navigable waters may be substituted for tide waters. This view of the jurisdiction over maritime torts has not been denied.

But it has been strongly argued that this is a mixed case, the tort having been committed partly on water and partly on land; and that, as the origin of the wrong was on the water, in other words, as the wrong began on the water (where the admiralty possesses jurisdiction), it should draw after it all the consequences resulting from the act. These mixed cases, however, will be found, not cases of tort, but of contract, which do not depend altogether upon locality as the test of jurisdiction, such as contracts of material-men, for supplies, charter-parties, and the like. These cases depend upon the nature and subject-matter of the contract, whether a maritime contract, and the service a maritime service to be performed upon the sea, or other navigable waters, though made upon land. The cases of torts to be found in the admiralty, as belonging to this class, hardly partake of the character of mixed cases, or have, at most, but a very remote resemblance.*

They are cases of personal wrongs, which commenced on the land; such as improperly enticing a minor on board a ship and there exercising unlawful authority over him. The substance and consummation of the wrong were on board the vessel—on the high seas, or navigable waters—and the injury complete within admiralty cognizance. It was the tortious acts on board the vessel to which the jurisdiction attached.

This class of cases may well be referred to as illustrating the true meaning of the rule of locality in cases of marine

---

* Thomas *v.* Lane, 2 Sumner, 2; The Huntress, per Ware, J., Davies, 85; United States *v.* Magill, 1 Washington C. C. 463; 4 Dallas, p. 345, 2d ed.; Plumer *v.* Webb, 4 Mason, 383–4; 1 Kent, 367* and n.

torts, namely, that the wrong and injury complained of must have been committed wholly upon the high seas or navigable waters, or, at least, the substance and consummation of the same must have taken place upon these waters to be within the admiralty jurisdiction. In other words the cause of damage, in technical language, whatever else attended it, must have been there complete.

Much stress has been given to the fact, by the learned counsel who would support the jurisdiction, in his argument, that the vessel which communicated the fire to the wharf and buildings, was a maritime instrument, or agent, and, hence, characterized the nature of the tort. In other words, that this characterized it as a maritime tort, and, of course, of admiralty cognizance.

But this, we think, is a misapprehension. The owner of a vessel is liable for injuries done to third persons or property by the negligence or malfeasance of the master and crew while in the discharge of their duties and acting within the scope of their authority. It is upon this principle that the defendants are liable, if at all, to the libellants for the damages sustained. The circumstance that the agents were in the employment of the owners on board the vessel, and that the negligence occurred, while so employed, and which occasioned the damage, gives to the libellants the right of action. But, if they had been employed upon any other structure in the river—on a raft, or floating platform, for work, on the river, and the fire had been communicated to the wharf and buildings on account of their negligence while so engaged, the right of action would have been the same. The jurisdiction of the admiralty over maritime torts does not depend upon the wrong having been committed on board the vessel, but upon its having been committed upon the high seas or other navigable waters.

A trespass on board of a vessel, or by the vessel itself, above tide-water, when that was the limit of jurisdiction, was not of admiralty cognizance. The reason was, that it was not committed within the locality that gave the jurisdiction. The vessel itself was unimportant. The fact, there-

fore, of its having taken place on board the propeller Falcon, in the present case, is not an element that imparts any peculiar character to the nature of the tort complained of. This is so in cases of collision, in which the offending vessel may be attached and proceeded against as one of the remedies for the wrong done. The jurisdiction of the admiralty does not depend upon the fact that the injury was inflicted by the vessel, but upon the locality—the high seas, or navigable waters where it occurred. Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance.

We can give, therefore, no particular weight or influence to the consideration that the injury in the present case originated from the negligence of the servants of the respondents on board of a vessel, except as evidence that it originated on navigable waters—the Chicago River; and, as we have seen, the simple fact that it originated there, but, the whole damage done upon land, the cause of action not being complete on navigable waters, affords no ground for the exercise of the admiralty jurisdiction. The negligence, of itself, furnishes no cause of action; it is *damnum absque injuriâ.* The case is not distinguishable from that of a person standing on a vessel, or on any other support in the river, and sending a rocket or torpedo into the city, by means of which buildings were set on fire and destroyed. That would be a direct act of trespass; but quite as efficient a cause of damage, as if the fire had proceeded from negligence. Could the admiralty take jurisdiction? We suppose the strongest advocate for this jurisdiction would hardly contend for it. Yet, the origin of the trespass is upon navigable waters, which are within its cognizance. The answer is, as already given: the whole, or at least the substantial cause of action, arising out of the wrong, must be complete within the locality upon which the jurisdiction depends—on the high seas or navigable waters.

The learned counsel, who argued this case for the appellants with great care and research, admitted that it was one of first impression; that he could find no case in the books

like it. The reason is apparent, for it is outside the acknow
ledged limit of admiralty cognizance over marine torts,
among which it has been sought to be classed. The remedy
for the injury belongs to the courts of common law.

DECREE AFFIRMED.