EMIL ALLISOT, PETITIONER-RESPONDENT, v. FEDERAL SHIPBUILDING AND DRYDOCK COMPANY, DEFEND-ANT-APPELLANT.

Argued March 27, 1950—Decided May 8, 1950.

446

*Mr. William L. Dill, Jr.,* argued the cause for appellant. *Mr. John J. Monigan, Jr.,* on the brief. *Messrs. Stryker, Tams & Horner* and *Mr. James A. Robottom,* attorneys.

*Mr. Patrick F. McDevitt* argued the cause for respondent. *Mr. Edward A. Markley* on the brief. *Mr. Louis Reich,* attorney.

The opinion of the court was delivered by

HEHER, J. The question here is one of jurisdiction. Respondent has an award of compensation under New Jersey law (*R. S.* 34:15-7 *et seq.*) for disability ensuing from an injury by accident arising out of and in the course of his employment as a painter by the appellant Federal Shipbuilding and Drydock Company in the performance of a contract with the Department of the Army for certain construction work aboard an army transport known as the "General Rose," while the vessel was moored alongside a dock in the Hackensack River, a navigable water of the United States, at the Company's shipyard in Kearny, New Jersey. The employer contends that the federal maritime law affords an exclusive remedy. It appealed to the Appellate Division of the Superior Court from the judgment of the Hudson County Court affirming the award of the Compensation Bureau; and we certified the appeal here on our own motion.

These are the essential facts and circumstances: The vessel was built during the late war, and commissioned and put into

service in the Pacific area as a transport for the United States Navy under the name of "Admiral Rodman." When hostilities ceased, the ship was sent to the Brooklyn Navy Yard and transferred to the Department of the Army. After service for a year in the North Atlantic as an Army transport for returning troops, this vessel and another, the "Admiral Coontz," were placed in appellant's shipyard at Kearny for "major alterations, conversion, and repairs." This was the testimony of the Chief of the Maintenance and Repair Section of the Water Division at the New York Port of Embarkation, who was "responsible for the maintenance and repair and for any alteration or conversion work" on Army transports "assigned to the New York Port of Embarkation." The witness said that "the scope of the work to be done" by appellant "was to convert the vessels from wartime Navy transports, on which only temporary merchant crew accommodations had been installed, into full-fledged Army peace-time transports, fully certificated by the United States Coast Guard as being in compliance with all the rules and regulations of that body and in full compliance with the International convention for the safety of life at sea and classified as passenger vessels by the American Bureau of Shipping," and to perform "certain repair work peculiar to each vessel." The witness was a naval architect and marine engineer by profession. The alterations required a "ripping out" and a reconstruction of much of the interior of the ship and the addition of a new deck, among other things. "Certain repair work" was done "on the propulsion equipment," characterized as "relatively minor;" and "minor relocations and modifications were made to the navigational equipment." But there were "major alterations" to the "general arrangement of the ship." In shipbuilding usage, "conversion" signifies "major alterations" as compared with "normal repairs." A witness said: "The majority of the stuff was ripped out, with the exception of the basic decks and strength bulkheads." This was true of "the entire ship, with the exception of the engine room and boiler room and tank sections." Another testified: "It was prac-

tically a hole. The only thing that was left was the engine room. The ship was wide open." The work on the then "Admiral Rodman," now the "General Rose," was done under a "lump-sum" contract, at a price exceeding $6,000,000. The work began when the vessel entered the shipyard on April 30, 1947, and was to be completed in December, 1948, allowing four and a half months for time lost as the result of a strike. During the course of the work, the vessel was manned by a "skeleton crew" of 48, who did not have their meals aboard ship. Their presence was not concerned with navigation but the doing of "routine work, such as scaling and red leading the hull, cleaning the condensers and boilers, to observe the work that was going on, so that they would be familiar with the various installations after they were concealed, and to give aid, counsel and advice to the technical inspectors who were there as the Army representatives." These were duties, the Chief of Maintenance and Repair conceded, that would be "unusual" in the case of mere repairs, but "normal" as regards vessels undergoing "major alterations," such as was the case here. The vessel was not under its own motive power while the work was in progress until steam was generated for a test run in November, 1948. The change of name occurred during the course of the work. The workman had general employment as a painter in the shipyard. He suffered his injury in a fall on the promenade deck of the ship on May 17, 1948, a year after the commencement of the work.

Deputy Director Corbin found that under the "contractual plans," 17 in number, "the vessel was a conversion unit;" that the "alterations and changes" were so extensive as to constitute "a rebuilding of the ship" to provide, *inter alia,* between 175 and 200 staterooms where there were but a few before; and that the workman's service "pertained to local matters" and was but incidentally related "to navigation and commerce." Judge Ziegener, in the County Court, concurred in the factual findings; and we perceive no ground for disturbing them. They are well founded in the proofs.

Under Article III, Section II of the Federal Constitution, the judicial power of the United States extends "to all Cases of Admiralty and Maritime Jurisdiction." And Article I, Section VIII confers upon the Congress authority to provide for the execution of all powers vested by the Constitution in the Government of the United States, or in any department or officer thereof. The legislative history is to be found in *Hardt v. Cunningham*, 136 *N. J. L.* 137 *(Sup. Ct.* 1947). Section 9 of the Judiciary Act of 1789 granted to the District Courts of the United States "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, * * * saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." 1 *Stat.* 76, *ch.* 20. This exclusive jurisdiction was incorporated without substantial change into the revision of the Judicial Code of 1911. 36 *Stat.* 1091, *ch.* 231.

 Generally, the jurisdiction of admiralty in matters of contract depends on the nature of the contract, but as to torts, injuries and offenses, it is determined by the locality of the act. In this country, the admiralty jurisdiction extends to acts committed on the high seas and other navigable waters. Injuries occurring on land are not within the cognizance of admiralty. *Philadelphia W. & B. R. R. Co. v. Philadelphia & Havre deGrace Steam Towboat Co.,* 23 *How.* 209, 215, 16 *L. Ed.* 433, 435 (1860) ; *The Plymouth (Hough v. Western Transportation Co.),* 3 *Wall.* 20, 18 *L. Ed.* 125 (1866) ; *Atlantic Transport Co. of West Virginia v. Imbrovek,* 234 *U. S.* 52, 34 *S. Ct.* 733, 58 *L. Ed.* 1208 (1914). In the case last cited, it was held that a stevedore engaged in loading and stowing the cargo of a ship lying in port in navigable waters was performing a maritime service, and was subject to the jurisdiction of admiralty. Three years later, in 1917, in *Southern Pacific Co. v. Jensen,* 244· *U. S.* 205, 37 *S. Ct.* 524, 529, 61 *L. Ed.* 1086 (1917), the Supreme Court ruled that stevedoring is maritime in nature, and the employment a "maritime contract," and state legislation providing compensation to longshoremen injured in the performance of

their work was in conflict with the cited provisions of the Federal Constitution. There, a stevedore suffered a fatal injury when his head struck the ship "at the top line" while operating an electric freight truck on the gangway, unloading lumber. State legislation constitutes an invasion of the federal maritime domain, it was declared, "if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations." The conclusion was that workmen's compensation is of a character wholly unknown to the common law, is incapable of enforcement by the ordinary processes of any court, and "is not saved to suitors from the grant of exclusive jurisdiction." In 1922, the Court ruled that the local law governed the case of a longshoreman injured on land, although engaged in loading a vessel. *State Industrial Commission of State of New York v. Nordenholt Corporation*, 259 *U. S.* 263, 42 *S. Ct.* 473, 66 *L. Ed.* 933. And in the same year, the Court held that a contract for the construction of a vessel was nonmaritime, and a carpenter injured while at work on the uncompleted ship lying at a dock in navigable waters forming part of the shipbuilding plant had his remedy under state law. It was said that neither the workman's "general employment, nor his activities at the time, had any direct relation to navigation or commerce;" and that "as to certain local matters, regulation of which would work no material prejudice to the general maritime law, the rules of the latter might be modified or supplemented by state statutes." *Grant Smith-Porter Ship Co. v. Rohde*, 257 *U. S.* 469, 42 *S: Ct.* 157, 66 *L. Ed.* 321 (1922). To the same effect: *Western Fuel Co. v. Garcia*, 257 *U. S.* 233, 42 *S. Ct.* 89, 66 *L. Ed.* 210 (1921).

Amendments to the Judicial Code adopted in 1917 and 1922, purporting to save to suitors, not only the common-law remedy, but also the right to compensation granted by local law to persons not the master or members of the crew of a

vessel, were declared unconstitutional as an unwarranted delegation of the legislative power of the Congress and as destructive of constitutional uniformity. *Knickerbocker Ice Co. v. Stewart*, 253 *U. S.* 149, 40 *S. Ct.* 438, 64 *L. Ed.* 834 (1920); *State of Washington v. W. C. Dawson & Co.*, 264 *U. S.* 219, 44 *S. Ct.* 302, 68 *L. Ed.* 646 (1924).

Thereafter, the Supreme Court held that a longshoreman at work in the hold of a vessel at dock in navigable waters was a "seaman" within the intendment of the Merchant Marine Act. *International Stevedoring Co. v. Haverty*, 272 *U. S.* 50, 47 *S. Ct.* 19, 71 *L. Ed.* 157 (1926).

Thus, the decision in the *Jensen case*, and those which came after, "carved out a domain in which * * * state law could not constitutionally afford compensation to maritime employees;" and the Longshoremen's and Harbor Workers' Compensation Act (44 *Stat.* 1424, *ch.* 509, 33 *U. S. C. A.*, § 901 *et seq.*) was adopted in 1927 "to fill that gap in the system of workmen's compensation." *Norton v. Warner Co.*, 321 *U. S.* 565, 64 *S. Ct.* 747, 88 *L. Ed.* 931 (1944). The Act provides compensation for the disability or death of an employee in maritime service, except a master or member of a crew of a vessel, from injury "occurring upon the navigable waters of the United States (including any dry dock)" where recovery therefor "through workmen's compensation proceedings may not validly be provided by State law." The exclusion of the master and crewmen was in accordance with the preference of the seamen's unions for the remedies of the maritime law over that system of compensation. The remedy afforded by the Act is exclusive. 33 *U. S. C. A.*, § 905.

Following the enactment of the Longshoremen's Act, the Supreme Court declared it to be the settled rule that "where the employment, although maritime in character, pertains to local matters, having only an incidental relation to navigation and commerce, the rights, obligations and liabilities of the parties, as between themselves, may be regulated by local rules which do not work material prejudice to the characteristic features of the general maritime law or interfere with its

uniformity." *Sullan Railway and Timber Co. v. Department of Labor,* 277 *U. S.* 135, 48 *S. Ct.* 505, 72 *L. Ed.* 820 (1928). And later that year, the Court said that state law providing compensation through commissions "might be treated as amending or modifying the maritime law in cases where they concern purely local matters and occasion no interference with the uniformity of such law in its international and interstate relations;" but that the "unloading of a ship" has "direct relation to commerce and navigation" and "is not a matter of purely local concern," and "uniform rules in respect thereto are essential." *Northern Coal & Dock Co. v. Strand,* 278 *U. S.* 142, 49 *S. Ct.* 88, 73 *L. Ed.* 232 (1928).

Is there valid coverage here under state law?

It has been said that the precise scope of admiralty jurisdiction is not a matter of "obvious principle or of very accurate history." *The Blackheath (United States v. Evans),* 195 *U. S.* 361, 367, 25 *S. Ct.* 46, 49 *L. Ed.* 236-238 (1904). Not all injuries sustained on board a vessel in navigable waters are within admiralty's exclusive jurisdiction over torts and the like. Not everyone at work on a ship lying in navigable waters is engaged in maritime service and therefore subject to the remedies of maritime law for the redress of injuries. The Longshoremen's Act recognizes that disability or death from an injury occurring on navigable waters may in certain circumstances come within the protection of state law. But where is the line of demarcation?

Generally, the distinction is between injuries on land and injuries sustained by persons in maritime service on a vessel in navigable waters. *State Industrial Commission v. Nordenholt Corporation, supra.* There is a fundamental difference between work on an uncompleted vessel, not yet in navigation, and so not the subject of a maritime contract, and repairs to a completed vessel. The test has been declared to be whether the claimant's "general employment" or "his activities at the time" had "any direct relation to navigation or commerce." *Grant Smith-Porter Co. v. Rohde, supra; Baizley*

*Iron Works v. Span,* 281 *U. S.* 222, 50 *S. Ct.* 306, 74 *L. Ed.* 819 (1930).

▮ But the borderline is vague and indistinct. No formula can be devised that will automàtically resolve every case. There is a marginal area that encompasses cases in which the employment combines characteristics common to both maritime and nonmaritime service, where neither the employment nor the particular service is so identified with navigation or commerce as that the application of the local rule would work material prejudice to the characteristic features of the general maritime law, or interfere with the proper harmony or uniformity of that law in its international or interstate relations, and so the matter is essentially of local concern and the rules of the maritime law may be modified or supplemented by state law without running afoul of the Federal Constitution. Such is the case here. The claimant was employed as a painter on land and on navigable waters—on vessels in process of construction and in the repair and reconstruction of vessels in service; neither his contract of employment nor his service in the reconstruction of the vessel in question was so directly related to navigation or commerce as to exclude local law in making compensation for injury suffered in the doing of his work on the ground of material prejudice to the general maritime law.

The case is within the "twilight zone" doctrine formulated in *Davis v. Department of Labor,* 317 *U. S.* 249, 63 *S. Ct.* 225, 87 *L. Ed.* 246 (1943), to resolve the practical difficulties and perplexities of administration that followed in the wake of the *Jensen* case. In that case, the deceased employee was a structural steel worker whose employer was subject to the state compensation act, but who at the time was performing a contract for the dismantling of an abandoned drawbridge which spanned a navigable river. The workman's assignment was the cutting of the steel, both on the bridge itself and on a barge underneath where the cut steel had been placed for towage to a storage place. The Supreme Court expressed the view that employees such as the decedent there "occupy that

shadowy area within which, at some undefined and undefinable point, state laws can validly provide compensation"—a "twilight zone in which the employees must have their rights determined case by case, and in which the particular facts and circumstances are vital elements," and which "includes persons such as the decedent who are, as a matter of actual administration, in fact protected under the state compensation act." The general presumption of constitutionality in favor of the State statute was invoked to sustain the state action in a case involving "doubtful and difficult factual questions," where there was "no conflicting process of administration."

In *DeGraw v. Todd Shipyards Co.,* 134 *N. J. L.* 315 (*E. & A.* 1946), the old Court of Errors and Appeals sustained an award of compensation under state law to a pipefitter who was injured while at work on a ship in navigable waters at the employer's shipyard in process of "a complete conversion from a freighter to a navy transport." The holding was that the work "had no direct relation either to navigation or commerce;" and the case was therefore within the principle of *Grant Smith-Porter Ship Co. v. Rohde, supra,* and *Sultan Railway and Timber Co. v. Department of Labor, supra.* The Federal Supreme Court denied *certiorari. Todd Shipyards Corporation v. DeGraw,* 329 *U. S.* 759, 67 *S. Ct.* 113, 91 *L. Ed.* 655 (1946).

In *Moores's Case,* 323 *Mass.* 162, 80 *N. E.* 2d 478 (1948), an employee was injured as the result of slipping on the step of a gun mount on board a vessel in a drydock floating in navigable water at the employer's plant at East Boston. The vessel was a 475-foot tanker chartered by the United States. An explosion off Cape Cod had disabled the ship and had damaged about 40 or 50 feet of its stern. It was towed to the employer's shipyard for repairs. The employee worked on piers, dry docks and ships at the employer's plant, where he was classified as a "rigger." He was injured while attempting to signal a crane operator. The case was deemed to fall within the twilight zone theory expounded in the *Davis case,*

and an award of compensation was sustained. The Federal Supreme Court on appeal affirmed the judgment on the authority of the *Davis case*. *Bethlehem Steel Co. v. Moore,* 335 *U. S.* 874, 69 *S. Ct.* 239, 93 *L. Ed.* 417 (1948).

And in *Baskin v. Industrial Accident Commission,* 89 *Cal. App.* 2d 632, 201 *P.* 549 (1949), compensation under state law was denied to a workman employed as a materialman in a shipyard, "on shore (or on ships under construction)," who was injured by a fall down a hold of a ship under repair. It was adjudged that contracts to repair a vessel "completed and put in commission" are "maritime in their nature," and so the case was governed by federal law. On October 24, 1949, the Supreme Court granted *certiorari* and vacated the judgment and remanded the cause "for reconsideration in the light" of the *Moores case* and the *Davis case*. It was noted that the Court's decision affirming the judgment in the *Moores case* was not available to the California court at the time of its consideration of the cause. 338 *U. S.* 854, 70 *S. Ct.* 99, 94 *L. Ed.* ——.

Under the principle of these cases, the workman here has recourse to local law for his remedy.

The judgment is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD and BURLING—6.

*For reversal*—None.