UMPQUA MARINE WAYS,
INC., Appellant,

v.

The UNITED STATES, Appellee.

No. 90–1011.

United States Court of Appeals,
Federal Circuit.

Feb. 12, 1991.

Joseph A. Yazbeck, Jr., Allen, Kilmer, Schrader, Yazbeck & Chenoweth, Portland, Or., argued for appellant. With him on the brief was Gina Anne Johnnie.

Allen D. Bruns, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director.

ON MOTION TO TRANSFER

Before RICH, NEWMAN, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

## ORDER

Umpqua Marine Ways, Inc. ("Umpqua"), appeals the decision of the Armed Services Board of Contract Appeals sustaining a termination of Umpqua's contract with the Government for default and denying its total cost claim on the terminated contract. *Umpqua Marine Ways, Inc.*, 89–3 BCA (CCH) ¶ 22,099, 1989 WL 82110 (A.S.B.C.A. 1989) ("*Umpqua*"). The Government's motion to transfer for lack of jurisdiction was deferred for consideration by the merits panel. *Umpqua Marine Ways, Inc. v. United States*, No. 90–1011, Order (Fed. Cir. May 24, 1990). Pursuant to 28 U.S.C. § 1631 (1988), we transfer the case to the United States District Court for the District of Oregon because the contract sounds in admiralty.

I

In 1981, the Naval Defense Surface Weapons Center ("Navy") issued an Invitation for Bids ("IFB") for the conversion of a 1977 fifty-foot Landing Craft–Mechanized Workboat into a Standard Navy Diving Boat and for the fabrication of a Diving System Module that could be loaded on and operated from the converted boat. The IFB described the projects as separate contracts. After submitting bids on both, Umpqua was awarded a single contract for the projects. The diving module portion of the contract was significantly more complicated and extensive (and correspondingly more expensive) than the specifications relating to the conversion of the workboat. The contract described the diving module as "an independent self sustained unit. It will be used for diving operations from a pier or any floating platform of adequate size, without the use of the altered 50′ LCM workboat if need be." Appellee Motion App. at 21.

The diving module is a large aluminum box that consists of a diver control station and a compressed air system with tanks, pipes and valves. The module is designed to provide support for underwater divers working on the bottoms of adjacent Navy ships. To that end, air tanks on the module were to be used to service a diver's SCUBA equipment or air hoses could extend from the module's tanks directly to the divers underwater. The contract specifications indicate the intention of the Government to place the diving module upon the converted boat. For instance, one clause required Umpqua to check "space restrictions shipboard ... to ensure piping/valve/gauge final shipboard installation will be satisfactory." *Umpqua* at 111, 122 (citing General Note 21 on Diver's Air System Drawing). Moreover, in the boat conversion project, the contractor was to fashion a hole in the deck through which the diving module could be lowered via crane into the hold. However, the Government acknowledges that the diving module could be lifted out of the hold later and used elsewhere. The module was also designed to be used upon a pier should that eventuality ensue.

Both the Government and Umpqua agree that the two projects are intermingled so as to make separation untenable because only a single contract was issued, performance was supervised together, and the dispute involves an intermingled appraisal of the costs relevant to both projects.

II

Generally, we have exclusive jurisdiction to review "an appeal from a final

decision of an agency board of contract appeals brought pursuant to section 8(g)(1) the Contract Disputes Act of 1978 (41 U.S.C. § 607(g)(1)).'' 28 U.S.C. § 1295(a)(10) (1988). However, we have recently held that the admiralty public contract jurisdiction statute, 41 U.S.C. § 603 (1988), requires that contract decisions in admiralty are to be appealed exclusively to U.S. District Courts. *Southwest Marine, Inc. v. United States*, 896 F.2d 532 (Fed. Cir.1990). The Government, contending that all aspects of this contract are maritime, moves that we order this appeal transferred. Umpqua responds that the contract, with its more extensive part being attributable to construction of a diving module, is not within traditional admiralty jurisdiction.

In the alternative, both parties urge that the equitable doctrine of pendent jurisdiction is applicable. *UMWA v. Gibbs*, 383 U.S. 715, 721–29, 86 S.Ct. 1130, 1136–41, 16 L.Ed.2d 218 (1966). Umpqua contends that the boat conversion project should be treated as pendent to a non-maritime module construction project, with jurisdiction over the whole to remain here. The Government contends that the module construction, if non-maritime in nature, should be considered pendent to the boat conversion with jurisdiction properly before the District Court. Unless we can hold the contract here wholly in or out of admiralty jurisdiction, we must address the question of whether the equitable doctrine of pendent jurisdiction may be applied to achieve jurisdiction over two joined claims when each claim has been statutorily consigned *exclusively* to two different federal fora. The complexity of this novel legal proposition is cemented by our agreement that the merits of the claims regarding the two construction projects are so inextricably intertwined as to thwart compulsory separation.

### III

■ The origins of admiralty are at least as old as the origin of those laws which we more familiarly apply. *Compare Darcy v. Allen*, 72 Eng.Rep. 830 (Moore 671), 74 Eng.Rep. 1131 (Noy 173), 11 Coke Rep. 86 (King's Bench 1602) *and* G. Mandich, *Venetian Patents (1450–1550)*, 30 J.P.O.S. 166 (1948) *with* G. Gilmore & C. Black, *The Law of Admiralty*, 9 n. 30 (2d ed. 1975) (citing the statute of 13 Rich. II, c. 5 (1389) which limited admiralty jurisdiction to ''a thing upon the sea''). ''A case in admiralty does not, in fact, arise under the constitution or laws of the United States. These cases are as old as navigation itself; and the law, admiralty and maritime, as it has existed for ages, is applied by our courts to the cases as they arise.'' *American Ins. Co. v. Ocean Ins. Co.*, 26 U.S. (1 Pet.) 511, 545–46, 7 L.Ed. 242 (1828). One of the ancient tenets of admiralty provides that a contract for the repair, renovation, or conversion of an existing vessel is maritime in nature because ''[i]n the baptism of launching she receives her name, and from the moment her keel touches the water she is transformed, and becomes a subject of admiralty jurisdiction. She acquires a personality of her own; becomes competent to contract, and is individually liable for her obligations; upon which she may sue in the name of her owner, and be sued in her own name.'' *Tucker v. Alexandroff*, 183 U.S. 424, 438, 22 S.Ct. 195, 201, 46 L.Ed. 264 (1902); *see also Thames Towboat Co. v. The "Francis MacDonald"*, 254 U.S. 242, 244, 41 S.Ct. 65, 66, 65 L.Ed. 245 (1920) (if vessel is not yet seaworthy, completion is new construction rather than repair or conversion); *Northwest Marine Iron Works v. United States*, 493 F.2d 652, 656, 203 Ct.Cl. 629 (1974). Accordingly, Umpqua was compelled to concede that the aspect of the contract directing conversion of the existing vessel falls within admiralty jurisdiction. Appellant's Response at 2 (citing *New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922)).

### IV

We must turn then to the question of whether the part of the contract concerning the construction of the diving system module lies within admiralty jurisdiction. Umpqua contends that the fabrication of ''an independent self sustained'' diving sys-

tem module that could conceivably be operated from a land-based pier, rather than from a floating vessel, cannot be a maritime contract. The Government contends that the fact that the diving module could later be removed from the vessel should not defeat the maritime nature of the construction of the diving module since the module was intended to be placed upon a vessel that was to be specifically customized to receive it.

The Government argues that the admiralty law governing contracts for repair of finished vessels, or contracts for supplies, services, or facilities furnished to finished vessels should convince us that the construction of the diving module involved a necessary supply for a Navy Diving Boat. 7A J. Moore, Federal Practice ¶ .230[4.–1], at 2781 (1990); *The General Smith*, 17 U.S. (4 Wheat.) 438, 438, 4 L.Ed. 609 (1819) ("necessaries have been furnished to a foreign ship") (Story, J.). In sum, the Government argues that if we were to conclude that the diving module fell within the category of a "supply" for the boat, then the entire contract would perforce be maritime. In support of this contention, the Government cites *American Shipbldg. & Dock Corp. v. John Rourke & Sons*, 4 F.2d 845 (5th Cir.), *cert. denied*, 268 U.S. 702, 45 S.Ct. 638, 69 L.Ed. 1166 (1925). In *American Shipbldg.*, the appellant contracted to construct a "loading and unloading apparatus" on a common barge to permit the use of the barge in the sugar trade. *Id.* The court's conclusion that the construction contract was maritime turned on the fact that the apparatus was to be affixed to a barge that was "completed" although never previously engaged in commerce, and therefore, the construction was an addition, or repair, to an already operable vessel. *Id.* The construction of an independent diving module is, however, clearly distinguishable from the loading apparatus, which was a permanent addition to the boat, and was not specifically designed to be easily removed to a location on land, as is the diving module. The same distinction applies to the "supplies and accessories" cases cited by the Government. *See, e.g., Cottle v. Gallup*, 432 F.2d 43 (1st Cir.1970)

(new engine); *Gerard Constr. Inc. v. Motor Vessel Virginia*, 480 F.Supp. 488, 490 (W.D.Pa.1979), *entry of final judgment*, 490 F.Supp. 475, *aff'd*, 636 F.2d 1208 (3d Cir.1980) (fuel and oil).

Similarly, in the case of The Jack–O–Lantern, *New Bedford Drydock Co. v. Purdy*, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922), the Supreme Court held that the dispositive issue of maritime jurisdiction under the repair doctrine was whether the original boat remained an existing vessel, regardless of the extent of the modification later performed. In that case, a simple ferry, or car float, was extensively transformed into a pleasure craft by the addition of motive power, steering gear, and an elaborate unremovable superstructure containing a new deck, a dance hall, rooms, and balconies. *Id.* at 98, 42 S.Ct. at 243. The court stated that the " 'test is whether the identity of the vessel has continued,' " not the "ultimate use to which the vessel is devoted." *Id.* at 99, 100, 42 S.Ct. at 243, 244 (citing *Thames Towboat Co. v. The "Francis MacDonald"*, *supra*). While The Jack–O–Lantern case does not fully dispose of the issue here, it serves to undercut Umpqua's argument that it should prevail simply because the magnitude of the module project was significantly greater than the boat conversion work.

## V

We conclude, therefore, that to determine the nature of this contract, we must consider the character of the diving module to be constructed in this contract. There was a time in the history of admiralty when the location of eventual performance was the sole pertinent question to be asked in determining whether a contract was maritime. The locality rule, known as the English rule, asks only whether the repair was on a completed vessel and therefore constructively located on the sea, or whether the supplies purchased were intended to be consumed upon the sea. However, the Supreme Court has rejected the English rule in favor of an American rule that admiralty jurisdiction "depends upon the subject-matter—the nature and character of the con-

tract." *North Pacific Steamship Co. v. Hall Bros. Marine Ry. Shipbldg. Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 222, 63 L.Ed. 510 (1919) (citing an earlier expression of the American rule in *Insurance Co. v. Dunham,* 78 U.S. (11 Wall.) 1, 26, 20 L.Ed. 90 (1870): "[T]he true criterion is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions.").

Husbandry of ship bottoms falls well within the traditional boundaries of a maritime service. In this case, however, the novel means by which the care and cleaning is accomplished, through the use of a remotely-located structure with air compressors and underwater breathing apparatus, raises the question of whether an entirely novel development can be included within the boundaries of a "traditional" activity.

The Supreme Court's decision in *Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), is a recent articulation of the American rule and also supplies us with the logic necessary to incorporate SCUBA support services within traditional admiralty jurisdiction. In tort law, the locality rule persisted longer, so that the context of the underlying activity was irrelevant when the actionable event clearly took place upon navigable waters. *The Plymouth,* 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1865). In *The Plymouth,* a fire on board ship passed to the wharf and then to the neighboring packinghouses on the Chicago River. The court held that although the fire began upon the docked ship the damage sustained was on land, thereby barring admiralty jurisdiction. The reasoning in *The Plymouth* which followed the English locality rule was effectively discarded in *Executive Jet,* 409 U.S. at 266–68, 93 S.Ct. at 503–04 (1972). In *Executive Jet,* the court dealt with a similar new development in admiralty when plaintiff's jet crashed into the navigable waters of Lake Erie after its engines ingested sea gulls flushed from around the runways of the defendant's airport. The only connection of the case to admiralty was the accidental fall of the plane into

Lake Erie, a fact that presumably would have satisfied the English rule for admiralty jurisdiction. In affirming a determination that admiralty jurisdiction was absent, the Supreme Court held:

> It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.

*Id* at 268, 93 S.Ct. at 504.

Subsequent to *Executive Jet,* the Ninth Circuit addressed an instructive example in which the operative novel subject matter had a dual character because of its potential use on land or at sea. *T.J. Falgout Boats, Inc. v. United States,* 508 F.2d 855 (1974), *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975). In *Falgout,* the plaintiff's boat was struck by a Sidewinder missile which plaintiff alleged was negligently released by a U.S. Navy airplane. The District Court had found the remedy to be exclusively under admiralty, for which the applicable statute of limitations had passed, rather than under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The Ninth Circuit affirmed, stating:

> Unlike the aircraft in *Executive Jet,* the subject aircraft is by its very nature maritime.... The United States Navy exists, in major part, for the purpose of operating vessels and aircraft in, on, and over navigable waters. Its aviation branch is fully integrated with the naval service and, whether land-based or sea-based, functions essentially to serve in sea operations.... We seriously doubt if appellants would question the applicability of the Suits in Admiralty Act if the aircraft had been stationed on an aircraft carrier.

*Id.* at 857 (citation and footnote deleted).

In sum, *Falgout* concluded that an airborne naval aircraft firing a Sidewinder missile over the high seas was a traditional naval operation, regardless of whether the

plane was based upon land or sea. The court reached this conclusion because the aircraft and missile in question were specifically adapted to, and were then being used in, this traditional maritime activity. In sum, the use of an air-to-sea missile, even if fired from an aircraft based on land, to strike an ocean-going vessel was fundamentally maritime. We find this example particularly apt for the analysis of the instant diving module.

## VI

The Diving System Module described in this contract was designed to be used to support purely maritime activities, whether actually placed aboard a naval vessel, or placed upon land and then connected to underwater seamen. It was not designed, as it might have been, to provide meaningful service in a non-marine environment, such as a decompression chamber in a naval hospital. That the Navy had the foresight to develop specifications that permit alternative future uses for the module does not diminish the fact that this specific module at all times was to be used in a traditional maritime activity. As further proof, many of the alternative use locations cited by the appellant included navigable vessels. Even when located on a pier, the module's air hoses would still be connected to U.S. seamen performing underwater services on the submerged hulls of Navy vessels. We therefore conclude that the compressed air system for which the Navy contracted, for use in supplying compressed air to the servicemen working under boats, "bear[s] a significant relationship to traditional maritime activity." *Executive Jet, supra*. More compelling is that the underwater boat tending activity "is fully integrated with the naval service and, whether land-based or sea-based, functions essentially to serve in sea operations" and therefore, "is by its very nature maritime." *Falgout Boats, supra*. In short, regardless of the boat conversion project, the construction of the particular diving module in question is part of a traditional maritime activity and must itself be wholly maritime even should it spend a part of its lifetime physically located on land.

Since we hold the instant contract to be wholly maritime, we must conclude, under *Southwest Marine,* that we lack jurisdiction to hear Umpqua's claims.

ACCORDINGLY, IT IS ORDERED THAT:

The case be and is transferred, pursuant to 28 U.S.C. § 1631, to the United States District Court for the District of Oregon.

Further proceedings in the Federal Circuit are terminated.